655 A.2d 886

MARYLAND AGGREGATES ASSOCIATION, INC. et al.

v.

STATE of Maryland et al.

No. 40, Sept. Term, 1994.

Court of Appeals of Maryland.

Order Nov. 7, 1994.

Opinion March 22, 1995.

**660**

Richard A. Reid (Royston, Mueller, McLean & Reid, on brief, Towson, William A. Franch, Franch & Jarashow, P.A., Annapolis, on brief), for petitioner.

Sharon B. Benzil, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief, Michael A. Millemann, Baltimore, on brief), for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

## ORDER

For reasons to be stated in an opinion later to be filed, it is this 7th day of November, 1994,

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court for Anne Arundel County is affirmed; and it is further

ORDERED, that the injunction issued on August 16, 1994 by the Circuit Court for Anne Arundel County prohibiting the State from implementing the statute in question while the appeal was pending be, and it is hereby, vacated, and it is further

ORDERED, that the mandate shall issue forthwith and the costs shall be paid by the appellants.

ELDRIDGE, Judge.

This case presents several constitutional challenges to Maryland Code (1973, 1989 Repl.Vol., 1994 Cum.Supp.), §§ 7–6A–10.1 and 7–6A–10.2 of the Natural Resources Article, which

relate to the appropriation of water in connection with certain surface mining operations.

## I.

Any individual, business, or governmental entity in Maryland "which may appropriate or use any waters of the State, whether surface water or groundwater," must first obtain a water appropriation permit from the Department of Natural Resources. Code (1973, 1990 Repl.Vol.), § 8–802 of the Natural Resources Article.[1] A surface mine must have a water appropriation permit to pump away water that would otherwise accumulate in the mine. The pumping process is known as "dewatering."[2] Surface mine dewatering removes groundwater, rainfall and other surface water runoff from the surface mine pit. If the rock to be mined lies beneath the water table, the mine operator must pump away a sufficient quantity of water to lower the water table around the pit.

Several Maryland counties include areas of karst terrain. In karst terrain, pockets of limestone and other carbonate rocks are slowly dissolved by water flowing or percolating underground, leaving behind underground cavities and channels.[3] Increasing the rate of water flow, for example by pumping, accelerates the formation of underground channels and of sinkholes.

---

1. An exception is made for certain domestic and small scale agricultural uses. Maryland Code (1973, 1990 Repl.Vol.), § 8–802(b) of the Natural Resources Article.

2. " 'Dewater' or 'dewatering' means to pump water out of a pit." Code (1974, 1989 Repl.Vol., 1994 Cum.Supp.), § 7–6A–10.2(a)(2) of the Natural Resources Article.

3. Karst terrain is defined in the Act as follows (§ 7–6A–10.2(a)(3)): " 'Karst terrain' means an irregular topography that is ... [c]aused by a solution of limestone and other carbonate rock; and ... [c]haracterized by closed depressions, sinkholes, caverns, solution cavities, and underground channels that, partially or completely, may capture surface streams."

The legislation challenged in this case, §§ 7–6A–10.1 and 7–6A–10.2 of the Natural Resources Article, is intended to protect landowners in karst terrain from the effects of surface mine dewatering. During the legislative process, the General Assembly received testimony from over fifty individuals, both lay and expert, and considered a number of technical reports concerning the effects of surface mine dewatering in karst terrain. Groups opposed to the proposed legislation, principally enterprises involved in surface mining, and groups pressing for its adoption, principally individual property owners and community associations from regions close to quarries, each engaged in vigorous lobbying. Ultimately, the General Assembly enacted the legislation regulating surface mine dewatering in karst terrain.

The Act contains the following legislative findings (§ 7–6A–10.1(a)):

"[I]n certain regions of the State dewatering of surface mines located in karst terrain may significantly interfere with water supply wells and may cause in some instances sudden subsidence of land, known as sinkholes. Dewatering in karst terrain may result in property damage to landowners in a definable zone of dewatering influence around a surface mine."

The Act protects "affected property owners in Baltimore, Carroll, Frederick, and Washington Counties where karst terrain is found," by establishing "zones of dewatering influence around surface mines...." § 7–6A–10.1(b). The Department of Natural Resources must establish the zone of dewatering influence when it issues the water appropriation permit for dewatering to the operator of a surface mine affected by the Act. § 7–6A–10.2(b)(1). The Department must scientifically determine the area affected by the mine's pumping activity, based on "local topography, watersheds, aquifer limits, and other hydrogeologic factors...." § 7–6A–10.2(b)(2).

The statute contemplates that the zone of dewatering influence may extend beyond the land owned by the mining

operation itself. Accordingly, subsection (c)(1) of § 7–6A–10.2 provides that, within the zone of dewatering influence, mine operators must "[r]eplace, at no expense to the owner of real property that is affected by the surface mine dewatering, a water supply that fails as a result of declining ground water levels...." An exception is made where the failure of the water supply is not caused by the surface mine operation (§ 7–6A–10.2(f)):

> "The Department may not require a [mine operator] to replace water supplies, as provided in this section, if the [mine operator] demonstrates to the Department by clear and convincing evidence that the proximate cause of the loss of water supply is not the result of pit dewatering."

The Act also establishes a scheme to compensate landowners for sinkhole damage that occurs within the zone of dewatering influence. Subsection (c)(2) of § 7–6A–10.2 provides as follows:

> "Upon a determination by the Department of proximate cause after the [mine operator] has received proper notice and an opportunity to respond and provide information, [the mine operator shall] pay monetary compensation to the affected property owner or repair any property damage caused as a result of the sudden subsidence of the surface of the land."

Furthermore, the Act directs the Department to create, by regulations, an administrative process for resolving claims brought under the Act, § 7–6A–10.2(h), and requires the Department to "provide opportunity for a contested case hearing," § 7–6A–10.2(g).

## II.

This litigation was commenced by Maryland Aggregates Association, Inc., an organization that represents the interests of the surface mining industry, and by the individual operators of hard rock quarries located in karst terrain in Baltimore,

Carroll, Frederick and Washington Counties.[4] Maryland Aggregates filed suit in the Circuit Court for Anne Arundel County on July 1, 1991, the day after the Act took effect, naming as defendants the State of Maryland, the Governor, the Attorney General, and the Secretary of the Department of Natural Resources.[5] Maryland Aggregates sought a declaratory judgment holding the Act unconstitutional on a number of grounds and an injunction against the enforcement and implementation of the Act.

In the circuit court, Maryland Aggregates contended that the Act violated numerous provisions of the Constitution of the United States and of the Constitution of Maryland. It contended that the Act violated its right to "substantive due process" because there was no rational basis for the legislation. It argued that the Act violated equal protection principles by making an unreasonable distinction between quarry operators and other large water users. Maryland Aggregates also claimed that the statute denied equal protection of the laws to the residents of the nineteen Maryland counties unaffected by the Act. The plaintiffs argued that the Act interfered with mine operators' constitutional rights to jury trial and deprived them of their property without just compensation. They contended that the statutory procedures for establishing zones of dewatering influence and for resolving claims under the Act were constitutionally deficient. Finally, Maryland Aggregates argued that the Act impermissibly granted judicial powers to an administrative agency in violation of the separation of powers requirement set forth in Article 8 of the Maryland Declaration of Rights.

The State responded to Maryland Aggregates' constitutional arguments on their merits, and also contended that the State

---

4. For convenience, we shall in this opinion refer to all of the plaintiffs collectively as "Maryland Aggregates."

5. Four individual owners of property near quarry sites were later permitted to intervene as defendants. These individuals were represented by the Clinical Law Office at the University of Maryland School of Law.

of Maryland, the Governor and the Attorney General were not proper parties to the litigation.

On March 9, 1992, the Circuit Court for Anne Arundel County granted Maryland Aggregates' motion for an interlocutory injunction against the enforcement of the Act. On March 7, 1994, however, the circuit court granted summary judgment in favor of the defendants, and filed a declaratory judgment rejecting all of Maryland Aggregates' constitutional contentions. The circuit court also agreed that the Secretary of the Department of Natural Resources was the only proper defendant.[6] Maryland Aggregates appealed to the Court of Special Appeals and, before any proceedings in the intermediate appellate court, petitioned this Court for a writ of certiorari, raising the same constitutional objections to the Act that it had pressed at trial. We granted Maryland Aggregates' petition. 335 Md. 341, 643 A.2d 441 (1994).

Meanwhile, in light of the circuit court's declaratory judgment in favor of the State, the Department of Natural Resources had begun to enforce the Act. Aggrieved by the Department's activity, Maryland Aggregates filed in the circuit court a further motion for an injunction against enforcement of the Act pending appeal. On August 16, 1994, observing that the case had been set for argument in this Court in early November 1994, the circuit court granted Maryland Aggregates' motion and enjoined enforcement of the Act pending appeal. This Court deferred action on the State's subsequent motion to dissolve, suspend, modify or stay the injunction until oral argument took place on November 6, 1994. On November 7, 1994, this Court entered an order affirming the judgment of the Circuit Court for Anne Arundel County and vacating the injunction. We now set forth the reasons for our earlier order.

---

**6.** Maryland Aggregates concedes that "the lower court's ruling on this point does not affect the outcome of this case...." (Maryland Aggregates' brief at 45 n. 7). Accordingly, we do not decide in the present case whether the defendants other than the Secretary of the Department of Natural Resources were proper parties to the litigation.

### III.

■ Maryland Aggregates first contends that the Act violates the Due Process Clause of the Fourteenth Amendment to the federal constitution and Article 24 of the Maryland Declaration of Rights because, according to Maryland Aggregates, there was no rational basis for its enactment.[7] The General Assembly found as a fact that "dewatering of surface mines located in karst terrain may significantly interfere with water supply wells and may cause in some instances sudden subsidence of land, known as sinkholes." § 7–6A–10.1(a) of the Natural Resources Article. Nonetheless, Maryland Aggregates maintains that it should be given an opportunity to prove at trial that quarries cause neither water supply failures nor sinkholes, and that "there was no evil at hand for correction" by the Legislature. (Maryland Aggregates' brief at 11).

Maryland Aggregates characterizes its disagreement with the legislative findings as a dispute of material fact which should have precluded the entry of summary judgment. The circuit court, however, held that "[t]he Defendants are not required to prove the wisdom of the statute as a matter of law ... but only that there is a rational basis for the statute as a matter of law." Since the court held that "[t]he Maryland General Assembly had a substantial rational basis to pass the Act," it granted summary judgment for the State on the so-called substantive due process contention.

This Court in *Bowie Inn v. City of Bowie,* 274 Md. 230, 236, 335 A.2d 679, 683 (1975), in rejecting a similar "substantive due process" challenge to economic regulatory legislation, emphasized that "[t]he wisdom or expediency of a law

---

**7.** Article 24 of the Maryland Declaration of Rights provides as follows:
"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the Law of the land."
The Fourteenth Amendment to the United States Constitution provides, in part, as follows:
"nor shall any State deprive any person of life, liberty, or property, without due process of law...."

adopted" by a legislative body "is not subject to judicial review, and the law will not be held void if there are any considerations relating to the public welfare by which it can be supported." *Accord: Dawson v. State,* 329 Md. 275, 283–284, 619 A.2d 111, 115 (1993); *Ogrinz v. James,* 309 Md. 381, 394–395, 524 A.2d 77, 84 (1987); *Montgomery County v. Fields Road,* 282 Md. 575, 583–585, 386 A.2d 344, 348–349 (1978); *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 426–427, 384 A.2d 748, 751 (1978); *Governor v. Exxon Corp.,* 279 Md. 410, 423–429, 370 A.2d 1102, 1110–1113 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Westchester West No. 2 v. Mont. Co.,* 276 Md. 448, 454–455, 348 A.2d 856, 860 (1975), and cases there cited. *See also General Motors Corp. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328, 340 (1992); *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

In *Bowie Inn v. City of Bowie, supra,* 274 Md. 230, 335 A.2d 679, as in the present case, industry representatives whose lobbying efforts had failed to prevent the enactment of legislation adverse to their interests, later challenged the legislation in court. Concluding that the plaintiffs in *Bowie Inn* were, "in effect, asking us to substitute our judgment concerning the wisdom of [the challenged ordinance] for that of the City Council of Bowie," this Court sustained the ordinance against the due process challenge. 274 Md. at 236, 335 A.2d at 683.

More recently the Supreme Court, in rejecting a similar due process challenge to a Michigan statute, stated (*General Motors Corp. v. Romein, supra,* 112 S.Ct. at 1112, 117 L.Ed.2d at 340):

"Having now lost the battle in the Michigan Legislature, petitioners wished to continue the war in court. Losing a political skirmish, however, in itself creates no ground for constitutional relief."

Likewise, having failed to convince the General Assembly of the merits of its position, Maryland Aggregates seeks to present its theories in court. Nevertheless, " 'courts do not

substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.'" *Governor v. Exxon Corp., supra,* 279 Md. at 425, 370 A.2d at 1111, quoting *Ferguson v. Skrupa, supra,* 372 U.S. at 730, 83 S.Ct. at 1031, 10 L.Ed.2d at 97. In particular, factual determinations made by a legislative body are not ordinarily subject to review in the courts. Even in the absence of legislative findings, "the legislature is presumed to have acted within constitutional limits so that if any state of facts reasonably can be conceived that would sustain the constitutionality of the statute, the existence of that state of facts as a basis for the passage of the law must be assumed." *Edgewood Nursing Home v. Maxwell, supra,* 282 Md. at 427, 384 A.2d at 751.

As Judge Cawood for the circuit court observed in the present case, the General Assembly heard testimony from geological experts, from representatives of the mining industry, and from concerned citizens and environmental groups. After briefly summarizing the conflicting testimony, Judge Cawood pointed out as follows:

"Needless to say, we do not decide whether Plaintiffs' or Defendants' experts are more likely to be correct. The proper forum for that is the Legislature. In passing almost any law, one can argue whether it has a rational basis, and which experts were really correct or really told the truth."

The circuit court properly deferred to the General Assembly's legislative findings. In *Bowie Inn v. City of Bowie, supra,* this Court explained why judicial review of legislative decision making must be narrowly circumscribed. Quoting from Justice Frankfurter's concurring opinion in *American Federation of Labor v. American Sash & Door Co.,* 335 U.S. 538, 553, 69 S.Ct. 258, 265, 93 L.Ed. 222, 230–231 (1949), the Court in *Bowie Inn* stated as follows (274 Md. at 238, 335 A.2d at 684):

"'Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably

bad may belie prophesy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests—the people.'"

*See also Governor v. Exxon Corp., supra,* 279 Md. at 428–429, 370 A.2d at 1113.

In light of these principles, Maryland Aggregates' disagreement with the factual findings of the General Assembly does not create an issue of fact which is material to the Act's validity under the due process clauses of the federal and state constitutions. As the circuit court pointed out, the question is not whether the General Assembly was correct; it is whether it was entitled to reach the conclusions embodied in the statute. The surface mine dewatering act establishes a compensation scheme for affected landowners that obviously bears a rational relationship to a problem that the General Assembly identified for redress. Under these circumstances, there is simply no basis upon which a court could conclude that the Act was beyond the authority of the General Assembly. The circuit court properly granted summary judgment in favor of the State with respect to Maryland Aggregates' substantive due process argument.

### IV.

Maryland Aggregates next contends that the Act employs classifications that violate the Equal Protection Clause of the Fourteenth Amendment and the equal protection component of Article 24 of the Maryland Declaration of Rights.[8] In particular, Maryland Aggregates complains that

---

**8.** Section I of the Fourteenth Amendment to the United States Constitution includes the following guarantee: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." While Article 24 of the Maryland Declaration of Rights does not contain an express equal protection clause, it nonetheless embodies the concept of

"quarries have been unfairly singled out" from other large consumers of groundwater in a manner that violates equal protection principles.[9]

▨▨▨ "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude ... and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985). Thus, classifications drawn by economic regulatory legislation are

equal protection. *See Verzi v. Baltimore County*, 333 Md. 411, 417, 635 A.2d 967, 969–970 (1994); *Kirsch v. Prince George's County*, 331 Md. 89, 96, 626 A.2d 372, 375, *cert. denied*, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993); *Murphy v. Edmonds*, 325 Md. 342, 353–354, 601 A.2d 102, 107 (1992), and cases there cited. Furthermore, although the federal and state guarantees of equal protection are "obviously independent and capable of divergent application," they are sufficiently similar that Supreme Court decisions applying the federal clause provide persuasive authority for this Court's application of Article 24. *Murphy v. Edmonds, supra*, 325 Md. at 354–355, 601 A.2d at 108.

9. Maryland Aggregates also suggests that the Act violates equal protection principles because it affects only four Maryland counties. It is clear from our cases, however, that "[a] statute ... is not invalid merely because it affects counties unequally.... Equal protection principles do not require the State to attack all of the various aspects of a problem at once; the government may legislate to remedy one phase of a problem and leave other phases to be resolved later." *Department of Transportation v. Armacost*, 299 Md. 392, 408–409, 474 A.2d 191, 199 (1984). *See also McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Supermarkets Gen. Corp. v. State*, 286 Md. 611, 409 A.2d 250 (1979), *appeal dismissed*, 449 U.S. 801, 101 S.Ct. 45, 66 L.Ed.2d 5 (1980); *Washabaugh v. Washabaugh*, 285 Md. 393, 404 A.2d 1027 (1979).

While this Court has invalidated territorial classifications on equal protection grounds, it has generally done so where the legislative classifications restricted access to economic opportunities, or imposed economic burdens, in a manner tending to favor residents of one county over residents of another. *See generally Verzi v. Baltimore County, supra*, 333 Md. 411, 635 A.2d 967, and cases there cited; *Bruce v. Dir., Chesapeake Bay Aff.*, 261 Md. 585, 276 A.2d 200 (1971); *Md. Coal Etc. Co. v. Bureau of Mines*, 193 Md. 627, 69 A.2d 471 (1949); *Dasch v. Jackson*, 170 Md. 251, 183 A. 534 (1936); *Havre de Grace v. Johnson*, 143 Md. 601, 123 A. 65 (1923). The present case does not involve such a classification, and Maryland Aggregates' equal protection challenge to the limited territorial scope of the Act is without merit.

ordinarily permissible under equal protection principles if they bear a rational relationship to a legitimate state interest.[10] The Supreme Court recently explained the scope of rational basis review under the Equal Protection Clause in *F.C.C. v. Beach Communications, Inc.,* 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211, 221 (1993), as follows:

> "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.... This standard of review is a paradigm of judicial restraint."

*See also Nordlinger v. Hahn,* 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

While this Court has not hesitated to strike down discriminatory economic regulation that lacked any reasonable justification, *e.g., Verzi v. Baltimore County,* 333 Md. 411, 635 A.2d 967 (1994), and *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372 (1993), we nevertheless accord to the decisions of legislative bodies a strong presumption of constitutionality. In *Murphy v. Edmonds,* 325 Md. 342, 367, 601 A.2d 102, 114 (1992), we quoted the summary of rational basis review set forth in *Whiting–Turner Contract. Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985), which stated that a statute

---

**10.** Maryland Aggregates argues that the Act should be subjected to a heightened standard of review because it implicates the "very important and valuable right," under common law principles, of a landowner to use percolating water "without fear of liability for the consequences thereof upon their neighbors." (Maryland Aggregates' brief at 16). For the reasons fully set forth in *Murphy v. Edmonds, supra,* 325 Md. at 362–364, 601 A.2d at 112, there is no merit to Maryland Aggregates' contention that legislation affecting a common law right should be subject to heightened scrutiny.

"can be invalidated only if the classification is without any reasonable basis and is purely arbitrary. Further, a classification having some reasonable basis need not be made with mathematical nicety and may result in some inequality. If any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time the law was enacted must be assumed."

*See also Briscoe v. P.G. Health Dep't,* 323 Md. 439, 448–449, 593 A.2d 1109, 1113–1114 (1991); *Hargrove v. Board of Trustees,* 310 Md. 406, 423, 529 A.2d 1372, 1380 (1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988); *Broadwater v. State,* 306 Md. 597, 607, 510 A.2d 583, 588 (1986); *State v. Wyand,* 304 Md. 721, 726–727, 501 A.2d 43, 46 (1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986); *Department of Transportation v. Armacost,* 299 Md. 392, 409, 474 A.2d 191, 199 (1984); *State v. Good Samaritan Hospital,* 299 Md. 310, 328, 473 A.2d 892, 901, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984).

According to Maryland Aggregates, the Act deprives the operators of surface mines of the equal protection of the laws because it fails to regulate other large appropriators of water. In light of the foregoing legal principles, it is apparent that this constitutional challenge to the Act lacks merit. The legislative distinction between quarries and other large water users is not an irrational one. The General Assembly received evidence that quarries have certain unique features with respect to water use. Quarries pump large amounts of water at a constant pace. Quarries cannot interrupt their pumping if emergency water conditions arise, since the pit might flood. Moreover, since a quarry must pump water where it wishes to extract rock, a quarry cannot move its pumping site if its appropriation of groundwater begins to damage the surrounding area.

Furthermore, even if surface mines were not distinguishable from other water users on the basis of such physical facts, the Legislature could have limited the statute to surface mines for other reasons. The General Assembly might have concluded, for example, that surface mines constituted a discrete and

manageable group around which to develop and test an effective compensation scheme, or that a mining operation would be more likely than another water user to have relevant hydrogeological data at hand. It is not necessary to identify the reasons that actually prompted the General Assembly to legislate as it did. Plainly, the decision to regulate the effects of surface mine dewatering can be justified on a number of grounds. The Act does not violate constitutional guarantees of equal protection, and the circuit court correctly granted summary judgment in favor of the State with regard to Maryland Aggregates' equal protection contentions.

## V.

Maryland Aggregates next argues that the Act violates the constitutional principle of separation of powers.[11] The statute requires a mine operator to replace failed water supplies within the zone of dewatering influence, unless the operator can demonstrate to the Department of Natural Resources that pit dewatering did not cause the water supply failure. § 7–6A–10.2(c)(1) and (f) of the Natural Resources Article. Furthermore, mine operators must compensate property owners for sinkhole damage within the zone of dewatering influence if the Department determines that the damage was caused by surface mine dewatering. § 7–6A–10.2(c)(2) of the Natural Resources Article. Maryland Aggregates objects to this method of determining its liability under the Act, arguing that "the Legislature, in authorizing the Department of Natural Resources to sit as the sole fact finder and judge in a dispute between neighboring property owner and quarry operator, has displaced the judicial branch of government in violation of Article 8." (Maryland Aggregates' brief at 26). The circuit court rejected this argument, observing, inter alia, that "the right of the Legislature to delegate powers to

---

11. Article 8 of the Maryland Declaration of Rights provides as follows:
    "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

administrative agencies has been recognized in this State for over 125 years."

■ It is true, as Maryland Aggregates suggests, that "any attempt to authorize an administrative agency to perform what is deemed a purely *judicial* function or power, would violate the separation of powers principle." *Shell Oil Co. v. Supervisor,* 276 Md. 36, 47, 343 A.2d 521, 527 (1975). This is so because the judicial power in Maryland is vested entirely and exclusively in the courts enumerated in Art. IV, § 1, of the Maryland Constitution.[12] *See generally Shell Oil Co. v. Supervisor, supra,* 276 Md. at 44–47, 343 A.2d at 526–527, and cases there cited. Nevertheless, Maryland Aggregates' Article 8 challenge to the Act lacks merit. It is clear from our cases that the power vested in the Department of Natural Resources to determine, in the first instance, factual issues relating to compensation under the Act is not judicial power but quasi-judicial power which may properly be exercised by the Department.

This Court has long recognized that the tasks of making factual determinations and resolving disputes are not reserved exclusively to the judicial branch of government. In *Shell Oil Co. v. Supervisor, supra,* 276 Md. at 45, 343 A.2d at 526, we quoted the following language from this Court's opinion in *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 282, 101 A. 710, 715 (1917):

"What is a judicial function does not depend solely on the mental operation by which it is performed or the importance of the Act. In solving this question, due regard must be had to the organic law of the state and the division of powers of government. In the discharge of executive and legislative duties, the exercise of discretion and judgment of the highest order is necessary, and matters of the greatest weight and importance are dealt with. It is not enough to

___

12. Art. IV, § 1, provides, in pertinent part, as follows:

"The Judicial power of this State is vested in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court."

make a function judicial that it requires discretion, delibera-
tion, thought, and judgment."

Later, in *Attorney General v. Johnson,* 282 Md. 274, 286, 385
A.2d 57, 64, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58
L.Ed.2d 97 (1978), the Court stated as follows:

"As we have already dismissed the notion that judicial
power in the constitutional sense is necessarily exercised
whenever facts are determined and legal principles are
applied to the facts found, we must ascertain what qualities
imbue such determinations with judicial power. While we
have not, until today, explicitly stated the proposition, we
agree with those courts which have said that the essence of
judicial power is the final authority to render and enforce a
judgment, ... and we think that conclusion is implicit from
our own case law."

In modern times, the complexity of governmental obli-
gations has resulted in increasing reliance upon administrative
agencies for the performance of both rulemaking and adjudi-
catory functions. This Court has recognized the delegation to
administrative agencies of both legislative and adjudicatory
power as legitimate, "as the separation of powers concept may
constitutionally encompass a sensible degree of elasticity and
should not be applied with doctrinaire rigor." *Dep't of Nat.
Res. v. Linchester,* 274 Md. 211, 220, 334 A.2d 514, 521 (1975).
*See also Christ v. Department,* 335 Md. 427, 441, 644 A.2d 34,
40 (1994). Indeed, as Chief Judge Murphy explained for the
Court in *County Council v. Investors Funding,* 270 Md. 403,
426–443, 312 A.2d 225, 238–247 (1973), the principal focus of
constitutional inquiry into the exercise of powers by adminis-
trative agencies is the limitation of agency authority, rather
than the nature of the authority exercised. Chief Judge
Murphy explained as follows (270 Md. at 436, 312 A.2d at 243):

"The constitutional doctrine of separation of powers ...
does not itself inhibit the delegation to an administrative
agency of a blend of executive or legislative powers with
powers judicial in nature; the determining factor is not so
much the specific powers granted to the administrative

agency, but rather the relationship of the courts to the exercise of that power."

Consequently, an agency in the executive branch may ordinarily perform adjudicatory functions in harmony with the principle of separation of powers provided that there is an opportunity for judicial review of the agency's final determination. *See, e.g., Attorney General v. Johnson, supra,* 282 Md. at 286–288, 385 A.2d at 64–65; *County Council v. Investors Funding, supra,* 270 Md. at 432–437, 312 A.2d at 241–243; *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 299–301, 236 A.2d 282, 286–287 (1967); *Burke v. Fidelity Trust Co.,* 202 Md. 178, 187–189, 96 A.2d 254, 260 (1953); *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 473–474, 84 A.2d 847, 850 (1951); *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945). Moreover, Maryland's courts have inherent power to correct agency adjudicatory determinations that are unsupported by substantial evidence, arbitrary, capricious or illegal. *See, e.g., Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 500–501, 331 A.2d 55, 65 (1975); *Heaps v. Cobb, supra,* 185 Md. at 379, 45 A.2d at 76; *Hecht v. Crook,* 184 Md. 271, 280, 40 A.2d 673, 677 (1945). *See also Medical Waste v. Maryland Waste,* 327 Md. 596, 610–611, 612 A.2d 241, 248 (1992).

It is well established that an administrative agency may, without violating the principle of separation of powers, adjudicate disputes of a type that might ordinarily also be resolved by a court. Thus, in *Branch v. Indemnity Ins. Co.,* 156 Md. 482, 144 A. 696 (1929), this Court sustained the Workers' Compensation Act, which removed from the courts, for initial resolution, a class of disputes involving the rights of private employers and employees, and created instead a system wherein such claims would be initially resolved in an administrative forum. *See also County Council v. Investors Funding, supra,* 270 Md. 403, 312 A.2d 225 (sustaining authority of administrative commission to, *inter alia,* levy fines and impose money damages); *Hecht v. Crook, supra,* 184 Md. at 277, 40 A.2d at 675 (observing, in 1945, that "innumerable

controversies are decided today, by boards of legislative creation, of a character that traditionally fell within the scope of judicial inquiry").

It is readily apparent in the present case that the Act, in allowing the Department of Natural Resources to determine issues relating to compensation for property damage caused by surface mine dewatering, does not violate the principle of separation of powers. While the Department is given the authority to make an initial determination of a mine operator's liability to property owners affected by mining activities, this initial determination does not involve the Department in the exercise of judicial powers. A mine operator aggrieved by the agency's initial determination is entitled to demand a contested case hearing at the administrative level and is entitled to judicial review. *See* § 7-6A-10.2(g) of the Natural Resources Article; Code (1984, 1993 Repl.Vol., 1994 Cum.Supp.), § 10-222 of the State Government Article. Accordingly, the Act neither vests the Department of Natural Resources with judicial power nor gives the Department unreviewable adjudicatory authority in violation of Article 8 of the Declaration of Rights and Article IV, § 1, of the Constitution. *See, e.g., Attorney General v. Johnson, supra,* 282 Md. at 284–287, 385 A.2d at 64–65; *Shell Oil Co. v. Supervisor, supra,* 276 Md. at 47, 343 A.2d at 527; *Dep't of Nat. Res. v. Linchester, supra,* 274 Md. at 223, 334 A.2d at 522–523; *County Council v. Investors Funding, supra,* 270 Md. at 429–436, 312 A.2d at 240–243; *Heaps v. Cobb, supra,* 185 Md. at 378–379, 45 A.2d at 76.

## VI.

Maryland Aggregates also contends that the Act is invalid for failure to provide for jury trial of issues regarding property owners' compensation. According to Maryland Aggregates, "disputes between landowners for damages have historically been actions at law with a right to trial by jury." (Maryland Aggregates' brief at 24). Since, under the Act, questions relating to compensation for property damage caused by mine dewatering are resolved in the first instance

by the Department of Natural Resources, Maryland Aggregates maintains that the Act violates Article 23 of the Maryland Declaration of Rights.[13]

As we have discussed, the statute vests in the Department of Natural Resources the primary power to resolve disputes relating to compensation. In *Murphy v. Edmonds, supra,* 325 Md. at 370–375, 601 A.2d at 116–118, this Court explained that the right under the Maryland Constitution to a civil jury trial concerns the allocation between judge and jury of the responsibility for decision making in judicial proceedings. Thus, as we emphasized (325 Md. at 372, 601 A.2d at 116),

> "[w]here ... the General Assembly has provided that a matter shall not be resolved in a judicial proceeding, by legislatively abrogating or modifying a cause of action, no question concerning the right to a jury trial arises. Since, under such circumstances, the matter will not be resolved in a judicial proceeding, the question as to whether a judge or a jury shall resolve the matter simply does not arise."

Consequently, this Court has specifically held the jury trial guarantee inapplicable where the legislature has committed to an administrative agency the initial decision making function with respect to a particular class of disputes. In *Branch v. Indemnity Ins. Co., supra,* 156 Md. at 486, 144 A. at 697, this Court stated that under the Workers' Compensation Act, "the method prescribed ... for the determination of an applicant's right to its specified benefits is essentially different from a civil proceeding in a court of law...." Therefore, the Court concluded, workers' compensation proceedings "could not properly be classified as a civil proceeding in a court of law within the meaning of ... the State Constitution," and the

---

**13.** Article 23 of the Maryland Declaration of Rights provides as follows:
"The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five thousand dollars, shall be inviolably preserved."
Article 5 of the Declaration of Rights also contains a guarantee of the right to jury trial. *See Luppino v. Gray,* 336 Md. 194, 200–201, 647 A.2d 429, 432 (1994).

constitutional jury trial guarantee was simply inapplicable to administrative proceedings involving workers' compensation. 156 Md. at 485–489, 144 A. at 697–698.[14]

Likewise, Article 23 does not apply to administrative proceedings under the Act challenged in the present case. The Act permits landowners damaged by surface mine dewatering to receive compensation for that damage from the operators of the mines. As we have explained, it was constitutionally permissible for the Act to establish the compensation system and to administer it through the Department of Natural Resources. The observations of this Court in *Branch v. Indemnity Ins. Co.*, *supra*, 156 Md. at 487, 144 A. at 697, are pertinent here:

---

**14.** Quoting the Supreme Court's decision in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61, 109 S.Ct. 2782, 2800, 106 L.Ed.2d 26, 53 (1989), which involved the claimed right to jury trial in certain bankruptcy proceedings, Maryland Aggregates argues that the Legislature may not, by "placing exclusive jurisdiction in an administrative agency," deprive litigants of the right to jury trial. Maryland Aggregates' argument is not persuasive. *Granfinanciera* involved the Seventh Amendment to the United States Constitution, which does not apply to the States. *See Curtis v. Loether*, 415 U.S. 189, 192 n. 6, 94 S.Ct. 1005, 1007 n. 6, 39 L.Ed.2d 260, 265 n. 6 (1974); *Bringe v. Collins*, 274 Md. 338, 341–345, 335 A.2d 670, 673–675, *application for stay denied*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 475 (1975). Furthermore, in *Granfinanciera*, the Supreme Court drew its Seventh Amendment principles partly from considerations relating to the jurisdiction of the federal courts under Article III of the United States Constitution, and partly from the distinction recognized in *Atlas Roofing Co. v. Occupational Safety Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), between "public rights" and "private rights." *Granfinanciera, S.A. v. Nordberg, supra*, 492 U.S. at 51–55, 109 S.Ct. at 2795–2797, 106 L.Ed.2d at 46–49.

Moreover, contrary to Maryland Aggregates' contentions, the holding in *Granfinanciera*, to the limited extent that it can be deemed persuasive, by analogy, to the Maryland Constitution and the Maryland courts, appears to be consistent with our holding in the present case. In one observation relevant to the present case, the Court stated as follows (*Granfinanciera, S.A. v. Nordberg, supra*, 492 U.S. at 52, 109 S.Ct. at 2796, 106 L.Ed.2d at 47):

"In certain situations, of course, Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable."

"It having been determined by this court that the ... act ... was a competent exercise of legislative authority, there would be apparent inconsistency in holding, nevertheless, that a right of jury trial according to the course of the common law must in such cases be recognized and unqualifiedly enforced."

Article 23 does not invalidate the General Assembly's decision to commit to the Department of Natural Resources the initial function of determining factual issues relating to compensation for property damage cause by surface mine dewatering.[15]

## VII.

Maryland Aggregates maintains that the regulation under the Act amounts to a taking of property without just compensation in violation of the federal and state constitutions.[16] In particular, Maryland Aggregates argues that the statute, "in impairing the right to pump water, has effected a taking because it substantially interferes with rights in the

---

15. While Article 23 does not constrain the legislature's power to commit initial decision making authority over a class of matters to an administrative forum, Article 19 of the Maryland Declaration of Rights may, under circumstances not presented in the instant case, impose a substantive limitation on that power. Article 19 provides as follows:

"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

16. The Takings Clause of the Fifth Amendment provides as follows: "[N]or shall private property be taken for public use, without just compensation."

This principle applies to the states through the Fourteenth Amendment. See *Dolan v. City of Tigard*, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304, 315 (1994), citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

Article III, § 40, of the Maryland Constitution reads as follows:

"The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

quarry parcel as a whole." (Maryland Aggregates' brief at 29).

As the circuit court recognized, it is significant to the present case that the surface mine dewatering Act has not yet been implemented in Maryland. The Supreme Court's statement in *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 494, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472, 494 (1987), is pertinent:

"The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation."

In *Hodel v. Virginia Surface Mining & Recl. Assn.,* 452 U.S. 264, 295–296, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1, 28 (1981), the Court explained the distinction in the context of a takings challenge to the federal Surface Mining Control and Reclamation Act, which had been held unconstitutional by the trial court and, consequently, never enforced. Observing that a takings challenge to regulatory legislation generally must be resolved by considering specific facts that might bear upon the economic impact of the regulation and the particular nature of the government interference, the Court continued as follows (*ibid.*):

"These 'ad hoc, factual inquiries' must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.

"Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, ... this Court is whether the 'mere enactment' of the Surface Mining Act constitutes a taking.... The test to be applied in considering this facial challenge is fairly straight-

forward. A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land. . . .' " *Agins v. Tiburon,* [447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980) ]. See *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)."

*See also Lucas v. South Carolina Coastal Council,* 112 S.Ct. 2886, 2893–2895, 120 L.Ed.2d 798, 813–815 (1992); *Keystone Bituminous Coal Assn. v. DeBenedictis, supra,* 480 U.S. at 495, 107 S.Ct. at 1247, 94 L.Ed.2d at 495 (observing that litigants "face an uphill battle in making a facial attack on the Act as a taking"); *Governor v. Exxon Corp., supra,* 279 Md. at 437, 370 A.2d at 1117; *Bureau of Mines v. George's Creek,* 272 Md. 143, 167–175, 321 A.2d 748, 761–765 (1974). *Compare, Maryland Port Admin. v. QC Corp.,* 310 Md. 379, 529 A.2d 829 (1987) (noting complexity of takings law in challenges to legislation as applied).

The Supreme Court has recently emphasized that it is only where "the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, [that] he has suffered a taking." *Lucas v. South Carolina Coastal Council, supra,* —— U.S. at ——, 112 S.Ct. at 2895, 120 L.Ed.2d at 815. *See also Governor v. Exxon Corp., supra,* 279 Md. at 437, 370 A.2d at 1117, and cases there cited. The Supreme Court has strictly construed the requirement that, for economic regulatory legislation to constitute a "taking," property must be rendered essentially valueless by government action. For example, the legislation challenged in *Keystone Bituminous Coal Assn. v. DeBenedictis, supra,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472, required mine operators to leave in place 50% of the bituminous coal lying beneath certain structures, and further required mine operators to provide compensation for subsidence damage caused by mining. The Court rejected the mine operators' facial takings challenge to the enactment, in part because (480 U.S. at 495–496, 107 S.Ct. at 1247, 94 L.Ed.2d at 495)

"petitioners have not claimed, at this stage, that the Act makes it commercially impracticable for them to continue mining their bituminous coal interests in western Pennsylvania. Indeed, petitioners have not even pointed to a single mine that can no longer be mined for profit."

Absent such a showing, the Court held that the mine operators had failed to show "any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking." 480 U.S. at 493, 107 S.Ct. at 1246, 94 L.Ed.2d at 493.[17]

Maryland Aggregates does not contend that the Act makes surface mining a commercial impracticability for its members, nor that it renders their property entirely without value. Not only does the Act not require mine operators "to sacrifice *all* economically beneficial uses" of their property, *Lucas v. South Carolina Coastal Council, supra,* 112 S.Ct. at 2895, 120 L.Ed.2d at 815, it does not prevent them from continuing with the economically beneficial use to which the mines are currently put. Although the statute may make surface mining more expensive, by requiring mine operators to compensate other property owners for damage cause by dewatering, land use regulation may "transfer wealth from the one who is regulated to another" without violating the takings clause. *Yee v. City of Escondido, Cal.,* 503 U.S. 519, 529, 112 S.Ct. 1522, 1529, 118 L.Ed.2d 153, 166 (1992). The principles set forth by the Supreme Court in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166, 177 (1986), are persuasive here:

"In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist. Given the propriety of the

---

**17.** By contrast, "[w]here the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation." *Yee v. City of Escondido, Cal.,* 503 U.S. 519, 522, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153, 162 (1992). *See also Dep't of Natural Resources v. Welsh,* 308 Md. 54, 521 A.2d 313 (1986).

governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *See also Concrete Pipe & Prod. v. Const. Laborers Pen. Tr.,* 113 S.Ct. 2264, 2290–2292, 124 L.Ed.2d 539, 577–578 (1993). The circuit court properly granted summary judgment in favor of the State on Maryland Aggregates' claim based on the takings clauses.

## VIII.

Finally, Maryland Aggregates contends that the mechanisms created by the Act for establishing zones of dewatering influence violate principles of procedural due process. Like the circuit court, we hold that Maryland Aggregates' contentions are without merit.[18]

This Court has recently explained the nature of the guarantee of procedural due process in the context of administrative proceedings (*Maryland State Police v. Zeigler,* 330 Md. 540, 559, 625 A.2d 914, 923 (1993)):

"Procedural due process, guaranteed to persons in this State by Article 24 of the Maryland Declaration of Rights, requires that administrative agencies performing adjudicatory or quasi-judicial functions observe the basic principles

18. In its reply brief, Maryland Aggregates also objects to the procedures for establishing claims to compensation under the Act. The Act provides that "[t]he Department shall adopt regulations to establish an administrative process to expedite the resolution of water supply loss or property damage claims arising under this section." § 7–6A–10.2(h) of the Natural Resources Article. The Department has not yet promulgated any such regulations because of the injunction against enforcement of the Act. Furthermore, while Maryland Aggregates argues that a mine operator is not entitled to judicial review of decisions relating to compensation, we agree with the State that a mine operator or property owner is entitled to review of a "decision of [the Department of Natural Resources] regarding a finding of proximate cause relating to water supply failure or property damage within a zone of dewatering influence. This decision is reviewable first as a contested case hearing...." (State's brief at 22). A party aggrieved by the result of the contested case hearing may seek judicial review in the circuit court. Code (1984, 1993 Repl.Vol., 1994 Cum.Supp.), § 10–222 of the State Government Article.

of fairness as to parties appearing before them. *See, e.g., Schultz v. Pritts*, [291 Md. 1, 7, 432 A.2d 1319, 1323 (1981)]; *Ottenheimer Pub. v. Employ. Sec. Adm.*, 275 Md. 514, 520, 340 A.2d 701, 704 (1975); *Rogers v. Radio Shack*, 271 Md. 126, 129, 314 A.2d 113, 115 (1974); *Dal Maso v. Bd. of Co. Comm'rs, supra*, 238 Md. [333] at 337, 209 A.2d [62] at 65 [ (1965) ]. *See also Heft v. Md. Racing Comm'n*, 323 Md. 257, 270–272, 592 A.2d 1110, 1116–1118 (1991), and authorities there cited."

Maryland Aggregates claims that the Act violates fundamental principles of fairness with respect to the establishment of zones of dewatering influence, stating that "the quarry owner is *not* afforded an opportunity under the Act for input into the delineation of the zone." (Maryland Aggregates' brief at 31). This position is clearly mistaken.

Under the Act, if a mine receives a water appropriation permit, then "the Department [of Natural Resources] shall establish, as a condition of the [mine operator's] surface mining permit ... a zone of dewatering influence around the surface mine." § 7–6A–10.2(b)(1) of the Natural Resources Article. Subsection (g) of § 7–6A–10.2 provides that "[t]he Department shall provide opportunity for a contested case hearing in accordance with the provisions of § 8–206 of this article." Section 8–206(g) in turn provides in part as follows:

"Upon written request the Department shall grant a contested case hearing if it determines that:

(1) The requester has a specific right, duty, privilege, or interest which is or may be adversely affected by the permit determination or license decision and which is different from that held by the general public...."

The establishment of the zone of dewatering influence is generally a decision in which a mine operator has a unique interest that may be adversely affected by an improper decision. Furthermore, the provisions of the Administrative Procedure Act that govern contested case hearings, Code (1984, 1993 Repl.Vol., 1994 Cum.Supp.), §§ 10–201 through 10–226 of the State Government Article, would apply to a hearing

brought under § 8–206. *See* § 10–202(d) (defining "contested case" to include the "amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing") and § 10–202(f)(2)(iv) (defining "license" to include a permit) of the State Government Article. *See generally Medical Waste v. Maryland Waste, supra,* 327 Md. 596, 612 A.2d 241; *Sugarloaf v. Waste Disposal,* 323 Md. 641, 663–668, 594 A.2d 1115, 1126–1128 (1991), and cases there cited. Contested case hearings under the Administrative Procedure Act include the rights to present evidence and to seek judicial review. §§ 10–213 and 10–222 of the State Government Article. Thus, contrary to Maryland Aggregates' contention, the operators of surface mines will have ample opportunity to contribute to the delineation of zones of dewatering influence in a manner that satisfies basic principles of fairness.

In sum, we conclude that the statute is not constitutionally deficient on any of the grounds urged by Maryland Aggregates.