658 A.2d 687

**Jong S. PARK, et al.**

v.

**BOARD OF LIQUOR LICENSE COMMISSIONERS FOR BALTIMORE CITY.**

**No. 106, Sept. Term, 1994.**

Court of Appeals of Maryland.

May 26, 1995.

Marvin Mandel (Timothy H. Sheridan, Nancy C. Hopkins, all on brief), Annapolis, for petitioners.

Sheldon H. Laskin, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (Retired), Specially Assigned.

KARWACKI, Judge.

The central issue which we shall resolve in this case is whether a provision dealing with zoning in Baltimore City enacted as part of Chapter 24 of the Acts of 1992 was a public local law within the meaning of Art. XI–A, § 4 of the Maryland Constitution and therefore exclusively delegated to the legislative authority of the Mayor and City Council of Baltimore.

I

Petitioners are individuals who operate their businesses pursuant to a Class B–D–7 beer, wine, and liquor license issued by the Board of Liquor License Commissioners for Baltimore City ("the Board"). Under a B–D–7 license, retail sale of beer, wine, and liquor was permitted for consumption on the premises or elsewhere from 6 a.m. until 2 a.m. seven days a week. Many of these businessmen operate a seven-day

package goods store with no on-premises consumption facilities. Under Chapter 24 of the Acts of Maryland 1992 ("Chapter 24"), all B–D–7 licensees are required either to add on-premises consumption facilities to their operations or to obtain a Class A–2 license, newly created by Chapter 24. A Class A–2 licensee is restricted to retail sale of beer, wine, and liquor for off-premises consumption between 9 a.m. and midnight Monday through Saturday. Appellants challenge that provision of Chapter 24, codified as § 18A of Maryland Code (1957, 1990 Repl.Vol., 1993 Cum.Supp.), Article 2B,[1] which provides that a business operation conducted under an A–2 license shall be considered a tavern for zoning purposes.

Article 2B encompasses the regulatory scheme in Maryland for the sale of alcoholic beverages. Prior to the enactment of Ch. 197 of the Acts of 1965, the Board was authorized to issue eight classes of liquor licenses. Class A licenses were for six-day package goods stores with no on-premises consumption. Class B licenses permitted seven-day sales at restaurants with ancillary package goods sales, provided that the gross receipts of such restaurants were comprised of a minimum percentage of food sales. Class C licenses were for non-profit clubs. Class D licenses covered six-day taverns with on and off-premises consumption. Special Amusement licenses encompassed operations with live entertainment. Sales on steamboats, railroads and airplanes required Class E, F and G licenses, respectively. Thus, prior to 1965, there was no provision for a license authorizing a seven-day dispensary making sales only for off-premises consumption.

The Class B–D–7 liquor license was originally authorized by Ch. 197 of the Acts of 1965, codified as Article 2B, § 29A. As noted above, restaurants issued a Class B license were required to have a minimum percentage of food sales. Section 29A eliminated the food sales requirement and was designed to alleviate a problem for certain restaurant owners who were finding it increasingly difficult to meet the food sales quota.

---

1. All statutory references are to Maryland Code (1957, 1990 Repl.Vol., 1993 Cum.Supp.) Article 2B, unless otherwise indicated.

Md.Code (1957, 1990 Repl.Vol.), § 29A(1) provides, in pertinent part:

"The Board ... may authorize the issuance of an additional license, to be known as a Class B–D–7 beer, wine and liquor license. Such special license shall authorize the holder thereof to keep for sale and sell all alcoholic beverages at retail at the place therein described, *for consumption on the premises or elsewhere,* during the hours from 6 o'clock a.m. to 2 o'clock a.m. on the day following, seven days per week." (emphasis added).

Two principal types of establishments conducted business under the Class B–D–7 license. Some maintained a separate package goods store, department, or section, with a full service bar available elsewhere on the premises. Others operated solely as a seven-day package goods store with no facilities for on-premises consumption. In its floor report, the House Economic Matters Committee, which had considered Senate Bill 346 proposing what ultimately was enacted as Chapter 24, explained the evolution of the B–D–7 package goods stores:

"During the hearing on Senate Bill 346, witnesses explained that, after the turmoil of the 1968 riots that occurred in Baltimore City neighborhoods, some taverns closed off their bar areas and began to sell for off-premises consumption only. Subsequent owners continued that practice and began to sell grocery items as well. Package goods licensees complain that these B–D–7 licensees have an unfair advantage because they are permitted to be open for longer hours than other package goods stores. Community associations complain because the B–D–7 licensees attract customers who drink on the street corners during the long hours the stores are open."

Based on a survey it conducted, the Board determined that 40 of the 178 B–D–7 licensees had no facilities for on-premises consumption and were operating solely as seven-day package goods stores. They were thus operated as if they held a Class A license, but for seven rather than for six days per week and

for longer hours.[2] Much opposition was waged against those businesses which operated solely as package goods stores, and the Board received numerous complaints, including reports of loitering, public urination, littering, and disorderly conduct in the area surrounding those establishments. The Board thereafter decided to eliminate the off-premises seven-day B–D–7 operations.

Prior to taking any action, however, the Board sought an opinion from the Attorney General. Analyzing the language in § 29A which authorized the sale of alcoholic beverages "for consumption on the premises or elsewhere," the Attorney General advised that the statute was ambiguous and, in the absence of corrective legislation or regulation, the Board could not limit a B–D–7 licensee to any particular minimum level of on-premises operation. 76 Op.Att'y Gen. 101 (1991). In the opinion of the Attorney General, the Legislature had used "or" as a careless substitute for "and." *Id.* at 104. Consequently, the Board proposed corrective legislation to the General Assembly which, *inter alia,* changed the troublesome "or" to an "and."

The Board's plan was composed of three parts. The first component was legislation to be passed by the General Assembly which would provide the statutory framework for the one-time conversion of a Class B–D–7 license to a new six-day Class A–2 license. The second component consisted of Board regulations to be adopted to implement the statutory changes. The final component was the modification of the zoning laws of Baltimore City to permit the one-time conversion from a B–D–7 to an A–2 license. This third stage was a key element of the plan and called for an amendment to the Zoning Ordinance to be enacted by the Baltimore City Council.[3]

---

2. At least one of Petitioners operates such a business as a "tavern" under a non-conforming use permit for purposes of the Baltimore City zoning ordinance.

3. Many of the B–D–7 licensed premises were operated in areas which were zoned residential. These licensees had obtained their liquor license, however, before the Baltimore City Zoning Ordinance was

Bills were simultaneously drafted for introduction in the Legislature and the Baltimore City Council. By March of 1992, the City Council Bill still had not been introduced, and the Senate Economic and Environmental Affairs Committee amended the Senate Bill to add subsection (h) to the proposed § 18A.. Subsection (h) provided:

"Notwithstanding the provisions of § 43 [4] of this Article, for purposes of zoning in Baltimore City, the operation conducted by a holder of a Class A–2 beer, wine and liquor off-sale package goods license shall be considered to be that of a tavern."

The purpose of that amendment was to ensure that holders of B–D–7 licenses could obtain a Class A–2 beer, wine and liquor license without the risk of violating any non-conforming use permits or zoning requirements.[5] Preamble to Chapter 24.

Chapter 24 has three main provisions. First, § 29A(1) provides that holders of a seven-day B–D–7 license must sell alcoholic beverages "for consumption on the premises *and* elsewhere." (emphasis added). · In light of the fact that a number of B–D–7 licensees do not have facilities for on-premises consumption, the Legislature next gave B–D–7 licensees a one-time option to apply for a newly created Class A–2

---

enacted, and were permitted to continue their operations under a non-conforming use permit. Under the Ordinance, they are not permitted to change or expand their non-conforming use. Article 30, Ch. 8, § 8.0–4(e) of the Baltimore City Code (1976, 1983 Repl.Vol.).

4. Article 2B, § 43 provides:

"No license or permit under the provisions of this article shall be issued in violation of any zoning rule or regulation as the same may from time to time exist under and by virtue of any ordinance or ordinances passed pursuant to the authority contained in Article 66B of the Code of Public General Laws of Maryland, title 'Zoning and Planning', or Chapter 599 of the Acts of the General Assembly of 1933."

5. Without the protection of the zoning provision, some B–D–7 licensees who chose to add facilities for on-premises consumption could be out of compliance with their non-conforming use permit and lose their business. Even if they chose to convert to an A–2 license, that also could be considered a change in use of the property and a violation of a non-conforming use permit.

six-day package goods license, to take effect May 1, 1993. § 29A(7). Alternatively, a licensee could elect to retain a B–D–7 license, provided he had facilities for on-premises consumption. Finally, § 18A(h) provides that the operations of A–2 licensees shall be considered "taverns" for zoning purposes. This section was designed to prevent any possibility that former B–D–7 licensees would be out of compliance with their non-conforming use permits solely because of their election to apply for an A–2 license.

On August 13, 1992, the Board promulgated Rule 5.03 which requires an operation under a B–D–7 license to be a "tavern." The rule defines a "tavern" as "an establishment where alcoholic beverages are habitually sold for on-premises consumption." Many of those opting to retain their B–D–7 status, therefore, would be required to make physical modifications to their existing facilities. Furthermore, under the rule, a tavern must have a bar or lounge, must make sales of packaged liquor over the bar rather than in a separate section or department, and must not sell "groceries, toiletries, household items and the like."

On January 4, 1993, Petitioners filed a complaint in the Circuit Court for Baltimore City seeking declaratory and injunctive relief. The complaint sought to have the newly enacted Chapter 24 declared unconstitutional and its enforcement enjoined. On March 5, 1993, Petitioners filed an application for *ex parte* injunction so that they would not have to make an election between the A–2 and the B–D–7 license before the issues in this case had been decided. The Board filed a motion for summary judgment on the same day. At a hearing on March 24, 1993, Petitioners' application for *ex parte* injunction was treated as one for an interlocutory injunction and denied.[6]

---

6. At the suggestion of the hearing judge the Petitioners made their election prior to the deadline provided in § 29A of March 31, 1993, but submitted their applications with a letter indicating that their election was being made under protest.

On April 20, 1993, Petitioners filed a cross-motion for summary judgment, which the trial court denied. The court, however, granted the Board's motion for summary judgment. Petitioners timely noted an appeal to the Court of Special Appeals, and that court, in an unreported opinion dated July 14, 1994, affirmed the judgment of the Circuit Court in favor of the Board. The intermediate appellate court held that the statute was constitutional and that, even if it were unconstitutional, the offensive provision could have been severed from Chapter 24. We issued a writ of certiorari to review the constitutionality of § 18A(h) and its severability.

## II

Petitioners contend that § 18A(h) violates Md. Const. Art. XI–A, § 4 ("the Home Rule Amendment") because it is a public local law concerning a subject area over which the Mayor and City Council of Baltimore has been granted express and exclusive legislative authority. Respondent maintains that, as § 18A(h) is an amendment to a public general law, it must also be a public general law. A public general law would not run afoul of the Home Rule Amendment, and Respondent therefore concludes that § 18A is valid. Petitioners also challenge the validity of Board Rule 5.03 as outside the scope of authority delegated to the Board by the General Assembly. Finally, Petitioners argue that Chapter 24 is invalid because it violates the "one subject" prescription of Md. Const. Art. III, § 29 and denies Respondents due process.

As a threshold issue, we must determine whether § 18A(h) is, in fact, a zoning provision. If the Legislature did not in any way effect a zoning change, the statute cannot violate the Home Rule Amendment. Both the circuit court and the intermediate appellate court found that the Legislature did not intend to enact a zoning change. Petitioners argue that these decisions are in direct contravention of the plain meaning of the language used in the preamble to § 18A.

The Board essentially argues that the term "zoning" as used in Article 2B, § 18A(h) does not mean zoning. We agree with

Petitioners that such an interpretation ignores the plain meaning of the statute. It is clear that the intent of the Legislature was to mandate that the Zoning Administrator of Baltimore City include Class A–2 package goods stores within the definition of "tavern" for the purpose of enforcing the Baltimore City Zoning Ordinance. The Board's original three-part plan also supports the fact that the zoning issue was always a major concern.

The clear intent of the Legislature was to address the growing problems associated with seven-day package goods stores while protecting the interests of those B–D–7 licensees who had operated for many years in such a manner with the tacit approval of the Board. The Legislature knew that without § 18A(h), the B–D–7 package goods stores could be closed under Baltimore City zoning regulations. Section (h) was added so that "no rezoning will be required in changing the license from a B–D–7 license to the A–2 license." The intent of the Legislature to make a zoning change is also plain on the face of the statute, and we must give effect to that intent as expressed by the Legislature. *Allied Vending, Inc. v. City of Bowie,* 332 Md. 279, 306, 631 A.2d 77, 90 (1993) (in interpreting a statute, the court must ascertain the intent of the legislature, and the primary source of that intent is the language of the statute).

### III

The Home Rule Amendment, Md. Const. Art. XI–A, § 4, provides:

"From and after the adoption of a charter under the provisions of this Article by the City of Baltimore or any County of this State, *no public local law shall be enacted by the General Assembly for said City or County on any subject covered by the express powers granted as above provided.* Any law so drawn as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law within the meaning of this Act. The term 'geographical sub-division' herein used shall be taken

to mean the City of Baltimore or any of the Counties of this State." (emphasis added).

A conclusion that a statute violates the Home Rule Amendment requires two findings: (1) that the law in question is a public *local* law, as opposed to a public *general* law; and (2) that the law addresses a subject covered by the express powers granted to the particular geographical subdivision. *See State's Attorney v. Mayor & City Council,* 274 Md. 597, 337 A.2d 92 (1975).

## A

■ The Board argues that any amendment to a public general law is also a public general law. As Article 2B, as a whole, is a public general law, and Chapter 24 amended that law, the Board asserts that § 18A is also a public general law. Respondent cites *State v. Petrushansky,* 183 Md. 67, 36 A.2d 533 (1944) for the proposition that all sections within Art. 2B are public general laws. Contending also that "the regulation of alcoholic beverages is clearly a matter of significant interest to the entire state," it argues that § 18A concerns more than one geographic area and satisfies the definition of a public general law. Petitioners respond that, because § 18A affects only Baltimore City, it is a public local law, citing *State v. Stewart,* 152 Md. 419, 137 A. 39 (1927).

*Petrushansky* involved an amendment to Article 2B which applied on a statewide basis. It prohibited the storage of alcoholic beverages by a licensee, except at certain designated storage facilities. There we were asked to determine whether the amendment prohibited a licensee from storing alcoholic beverages in his home for his personal use. In deciding whether the Legislature intended the statute to apply to the alleged conduct, we stated that "[t]he proper rule of construction is that all parts of such an article of the Code as this is, must be read together as they form part of a general system." *Petrushansky,* 183 Md. at 71, 36 A.2d at 535 (citations omitted). We held that the purpose of Article 2B was to regulate the manufacture and sale of alcoholic beverages, which is conduct of an essentially commercial nature. Thus, the

amendment was not intended to apply to the conduct of the defendants, which was of a noncommercial nature. Whether the amendment was a public local law or a public general law was never at issue in *Petrushansky.*

■■■■ *Stewart* involved an amendment to Article 56, dealing with motor vehicle licensing. Article 56, as a whole, is a public *general* law. The amendment at issue in that case was an act which empowered the police commissioner to make traffic rules and regulations for Baltimore City. We held that the amendment was a public local law, despite the fact that the act was couched as an amendment to a public *general* law, because the subject matter was "exclusively local to Baltimore City." *Stewart,* 152 Md. at 425, 137 A. at 42. "[T]he mere form which the enactment has taken, that of an amendment to a public general law, is not controlling. It is the subject-matter and substance, rather than its designation or form, which is conclusive" on the issue of whether an enactment is a public local law. *Id.; see also Steimel v. Board of Election Supervisors,* 278 Md. 1, 357 A.2d 386 (1976) (The test in determining whether an act is a public local law or a public general law is "whether the law, in subject matter and substance, [is] confined in its operation to prescribed territorial limits and [is] equally applicable to all persons within such limits." A public general law "deals with the public general welfare, a subject which is of significance not just to any one county, but rather to more than one geographical subdivision, or even to the entire state."); *State v. County Comm'rs of Baltimore County,* 29 Md. 516, 520 (1868) ("Local laws ... are distinguished from Public General Laws, only in this [sic] that they are confined in their operation to certain prescribed or defined territorial limits ...").

In *Stewart,* we specifically rejected the contention made by the Board in this case that any amendment to a public general law must also be a public general law simply because it is an amendment.

"Otherwise, any law could be removed from the domain of public local laws by the mere act of the Legislature in

calling it an amendment to a public general law. If such could be done in the present case, the Legislature could, by such a device, evade the constitutional prohibition in respect to local legislation."

*Stewart,* 152 Md. at 425, 137 A. at 42 (citations omitted); *see also Cole v. Secretary of State,* 249 Md. 425, 433, 240 A.2d 272, 277 (1968) ("Nor does the fact that the statute takes the form of an amendment to the general law make it a public general law rather than a public local law if its subject matter is exclusively local.") Adopting Respondent's argument would "result in the complete frustration of the object of the [Home Rule] amendment." *Stewart,* 152 Md. at 424, 137 A. at 41–42.

Although Article 2B as a whole is a public general law, the amendment at issue here, Section 18A(h), has a subject matter which is "exclusively local to Baltimore City." Despite the fact that Chapter 24 amended a public general law, it becomes clear when one examines the geographic scope of its subject that it is a public local law.

B

Standing alone, the fact that § 18A(h) is a public local law does not invalidate it as a violation of the Home Rule Amendment. We must also determine whether the zoning change enacted by that statute is within the exclusive power of the City of Baltimore. Zoning authority over Baltimore City has been expressly granted to the Mayor and City Council of Baltimore by Md.Code (1957, 1988 Repl.Vol.), Art. 66B, § 2.01:

"(a) *Grant of powers.*—For the purpose of promoting the health, security, general welfare, and morals of the community, the Mayor and City Council of Baltimore City are hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, off-street parking, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, signs, structures, and land for trade, industry, residence, or other purposes."

That section further states that "[i]t has been and shall continue to be the policy of this State that *planning and zoning controls shall be implemented by local government.*" *Id.* at § 2.01(b)(2) (emphasis added).

Pursuant to that grant of authority, the Mayor and City Council adopted comprehensive planning and zoning controls which are now codified in Baltimore City Code of 1976, Art. 30 (1983 Repl.Vol., 1990 Supp.) Thus, this is an area in which the General Assembly has determined that Baltimore City shall have the exclusive power to act.[7]

> "[W]hile the General Assembly has the authority to determine what powers are to be exercised by Baltimore City or the charter counties, the General Assembly may not enact a *public local law* for the City or any charter county which modifies the powers so granted. If the General Assembly wishes to diminish the powers granted to Baltimore City or a charter county, it must do so by amending the acts which granted the powers. It may not do so by enacting a separate public local law which is merely inconsistent with the acts granting the express powers to the City or to the charter counties."

*State's Attorney of Baltimore City v. City of Baltimore*, 274 Md. 597, 604, 337 A.2d 92, 97 (1975). Modifying the definition of a "tavern" under the zoning laws, therefore, is a task reserved to the Mayor and City Council of Baltimore.

The Board acknowledges that, prior to the enactment of Article 2B, § 18A(h), many of the B–D–7 licensed premises were operated as non-conforming uses in residential districts. These non-conforming uses were governed by Baltimore City Code, Article 30, Chpt. 8 (1983 Repl.Vol.). Under the Baltimore City Code, a non-conforming use may not be "extended, expanded, enlarged or added to in any manner." § 8.0–4(e).

---

7. Baltimore City has not only enacted a comprehensive zoning ordinance, it has designated taverns and package goods stores as uses which are distinct from one another. Baltimore City Code of 1976, Art. 30, § 6.2–1.

In addition, if the non-conforming use is discontinued, it is terminated under the Code. § 8.0–4(f).

■ Now, under § 18A(h), if these operations are conducted pursuant to an A–2 license, they must be considered taverns for zoning purposes. Petitioners are in a catch–22 situation. If Baltimore City refuses to be bound by the zoning act of the Legislature, those Petitioners with a B–D–7 license who operate their businesses as non-conforming uses will continue to have only those privileges permitted a non-conforming use. They may not expand, enlarge, or alter that use. Thus, if they make the changes required under the Board's regulations to comply with the terms of their licenses, they will violate their non-conforming uses. On the other hand, if the City of Baltimore honors the zoning reclassification of § 18A(h), many of the Petitioners who elect to convert to an A–2 license and whose properties are located in residential districts will find themselves operating taverns within districts where taverns are not permitted. Petitioners will again be open to attack and at risk of losing their businesses. Because the Petitioners faced an immediate threat of the loss of their businesses by the Hobson's choice forced upon them by Section 18A(h), we also reject the assertion by Respondent that they did not have standing to challenge its validity. *See, e.g.,* *11126 Baltimore Boulevard, Inc. v. Prince George's County,* 684 F.Supp. 884 (D.Md.1988), *rev'd on other grounds,* 886 F.2d 1415 (4th Cir.1989) ("Plaintiff is a defendant in a case brought by the County to enforce [the challenged zoning provision] and is also a defendant in an eviction proceeding brought by plaintiff's landlord as a result of the zoning violation. Plaintiff therefore faces a threat to its business survival—an immediate threat from which it can obtain redress if successful in this case. Accordingly, plaintiff has standing ...").

As § 18A(h) is a public *local* law, and the law addresses a subject covered by the express powers granted to the Mayor and City Council of Baltimore, it violates the Home Rule Amendment and is invalid.

C

 The Board also contends that, even if § 18A(h) is unconstitutional, it is severable from the other provisions of Chapter 24. Maryland Code (1957, 1994 Repl.Vol.), Art. 1, § 23 provides:

"The provisions of all statutes enacted after July 1, 1973 are severable unless the statute specifically provides that its provisions are not severable. The finding by a court that some provision of a statute is unconstitutional and void does not affect the validity of the remaining portions of that statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent."

This section enacted by Ch. 241 of the Acts of 1973, is essentially a codification of our previous case law. While an entire act need not always be struck down because one or more of its provisions is void, the entire act must fall when the provisions are so connected "that it cannot be presumed that the Legislature would have passed one without the other." *Culp v. Commissioners of Chestertown,* 154 Md. 620, 631, 141 A. 410, 415 (1928). "The test is, would the legislative body have enacted the statute or ordinance if it knew that part of the enactment was invalid?" *Sanza v. Maryland Bd. of Censors,* 245 Md. 319, 338, 226 A.2d 317, 327 (1967); *see also Davis v. State,* 294 Md. 370, 383, 451 A.2d 107, 114 (1982). Analysis of the legislative history of § 18A(h) compels the conclusion that it is not severable.

The preamble to Chapter 24 states that the "purpose of the Act is to grant holders of B–D–7 licenses the ability to obtain newly established Class A–2 beer, wine, and liquor license *without the risk of violating zoning requirements* and suffering the loss of their business." (emphasis added). Chapter 24, if enacted without § 18(h), would have endangered the A–2 licensees' businesses. The Senate Economic and Environmental Affairs Committee noted in its bill analysis that:

"The intent of Senate Bill 346 is to remove that ambiguity and allow a one time conversion of B–D–7 Beer, Wine, and

Liquor licenses to a Class A–2 Beer, Wine, and Liquor license.

The Committee's floor report highlights the importance of the zoning provision:

> Without this change, those B–D–7 licensees who are not operating as a tavern may be closed under Baltimore City zoning regulations. However, A–2 licenses will continue to be viewed as a tavern operation for purposes of local zoning in order that the A–2 licensees will be able to continue operating their current business as packaged goods stores without further zoning changes."

Further, § 43 specifically prohibits the issuance of an alcoholic beverage license in violation of any zoning rule or regulation. If the zoning provision of the challenged law is severed, § 43 would apply to the remaining portions of Chapter 24 to prevent the Board from issuing an A–2 license to any establishment operated pursuant to a non-conforming use, unless that use encompassed operation as a package goods store. Section 18A(h) specifically refers to § 43, and the Legislature intended that the zoning provision give effect to the new licensing change notwithstanding the possible consequences of § 43.

The Legislature was keenly aware of the relationship between zoning and liquor licenses when it enacted Chapter 24. Section 18A(h) is integral to the statute, as indicated by the legislative committee reports, the existence of a companion zoning bill in Baltimore City,[8] and the preamble to Chapter 24. We agree with the circuit court that

---

8. Respondents have also filed a motion to strike, *inter alia,* several documents contained in Petitioners' Appendix concerning Baltimore City Council Bill 168, as they are not part of the record made in the circuit court. At issue are various letters and memoranda, portions of the Bill files for Senate Bill 346 and City Council Bill 168, and a copy of the proposed Baltimore City Council Bill. When viewed in light of the three-part plan in enacting Chapter 24, and the important role which City Council Bill 168 played in that plan, all of these documents become relevant parts of the legislative history and indicia of the legislative intent in enacting Chapter 24. As such, we shall take judicial notice of those documents and deny Respondents' motion to strike them

"the purpose of chapter 24 was to achieve an accommodation between the Board's desire to address problems surrounding package goods stores, by a return to the original intent of the B–D–7 license, while holding harmless the licensees who justifiably had relied upon the core privileges protected by the B–D–7 operation."

We conclude that the Legislature would not have enacted Chapter 24 without the zoning provision, and § 18A(h), therefore, is not severable.

Chapter 24, as enacted, violates the Home Rule Amendment and is invalid. We need not, therefore, address Petitioners contentions regarding Board Rule 5.03, because it is dependent upon the valid enactment of Chapter 24. We also need not address Petitioners' contentions that Chapter 24 violates the "one subject" requirement of Md. Const. Art. III, § 29, or whether Petitioners have been denied due process.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR THE ENTRY OF A JUDGEMENT DECLARING CHAPTER 24 OF THE ACTS OF 1992 UNCONSTITUTIONAL AND VOID. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*

---

from Petitioners' Appendix. *See Legg v. Mayor, Counsellor & Aldermen of City of Annapolis,* 42 Md. 203, 221 (1875) ("whenever a question arises in a court of law as to the existence of a statute, or as to the time when it took effect, or as to its precise terms, the judges who are called upon to decide such question, have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question; the best and most satisfactory evidence in all cases being required.")