837 A.2d 931

### Nicholas PISCATELLI, et al.

v.

### BOARD OF LIQUOR LICENSE COMMISSIONERS.

No. 85, Sept. Term, 2002.

Court of Appeals of Maryland.

Dec. 9, 2003.

**624**

Peter A. Prevas (Prevas and Prevas; Melvin J. Kodenski, on brief), Baltimore, for appellants.

Andrew H. Baida, Solicitor General (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued Before BELL, C.J., and ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

ELDRIDGE, Judge.

Under Maryland Code (1957, 2001 Repl.Vol.), Article 2B, § 11–304(d)(2), the holder of a class B–D–7 liquor license in Baltimore City must "cease all operations, including the serving of alcoholic beverages or food and providing entertain-

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

ment," between "2 a.m. and 6 a.m." The principal issue raised in this case is whether that portion of § 11–304(d)(2) relating to ceasing operations, serving food, and providing entertainment between 2 a.m. and 6 a.m., violates Article XI–A of the Maryland Constitution, known as the Home Rule Amendment. The plaintiffs-appellants also present a statutory interpretation issue concerning the applicability of § 11–304(d)(2) and a federal constitutional challenge to § 11–304(d)(2) based upon the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.[1]

## I.

Nicholas Piscatelli is the individual licensee for the Redwood Trust, LLC, both of whom are the plaintiffs-appellants in this case (hereafter collectively referred to as "Piscatelli"). Piscatelli operates a tavern business with live entertainment and dancing in Baltimore City, located in a zoning district where such use is conditionally permitted. A "Conditional Use Approval" by the Baltimore City Board of Municipal and Zoning Appeals, dated October 26, 2001, and a "Use" permit issued by the Baltimore City Department of Housing and Community Development on November 2, 2001, authorize Piscatelli to use the premises as a restaurant, serving food and providing live entertainment and dancing, "after hours" which means after 2 a.m. Piscatelli has a class B–D–7 liquor license, which authorizes the licensee "to sell all alcoholic beverages at retail at the place in the license described, for consumption on the premises and elsewhere from 6 a.m. to 2 a.m. on the following day, 7 days a week." Maryland Code (1957, 2001 Repl. Vol), Art. 2B, § 8–203(d)(3).[2]

When Piscatelli first opened for business in November 2001, he kept the establishment open until 4 a.m. on weekends,

---

1. The plaintiffs-appellants raise no issues under Articles 24 or 40 of the Maryland Declaration of Rights.

2. All statutory references in this opinion will be to Maryland Code (1957, 2001 Repl.Vol.), Article 2B, unless otherwise specified.

relying on the Baltimore City zoning approval and the use permit. Piscatelli also requested that the Board of Liquor License Commissioners for Baltimore City (hereafter referred to as the "Liquor Board") convert his liquor license from a class B–D–7 license to a class B license, as a class B license would allow him to operate and sell food (although not sell alcoholic beverages) after 2 a.m. At a hearing on December 6, 2001, the Liquor Board denied Piscatelli's request to convert his license and informed Piscatelli that it would enforce the 2 a.m. closing time required by § 11–304(d)(2). The record does not disclose that Piscatelli sought judicial review of the decision refusing to convert his license.

On December 8, 2001, Liquor Board inspectors arrived at Piscatelli's business at about 2:10 a.m. and found approximately 250 to 300 people on the premises, dancing to music supplied by two disc jockeys. Piscatelli and his employees refused to comply with the inspectors' request to cease operations. The Liquor Board then issued a "Violation Notice" to Piscatelli for keeping his establishment open in contravention of § 11–304(d)(2), and for refusing to cooperate with the Liquor Board inspectors, as required by Liquor Board Rule 3.02.[3] At a hearing before the Liquor Board, Piscatelli conceded that the establishment was open after 2 a.m. on the night in question. The Board decided that Piscatelli had violated § 11–304(d) and Rule 3.02, rejected Piscatelli's legal arguments, and imposed penalties consisting of fines or, in the alternative, a suspension.

Piscatelli filed in the Circuit Court for Baltimore City a petition for judicial review, presenting the same legal arguments which were made before the Liquor Board and which are made before this Court. The Circuit Court affirmed the decision of the Liquor Board, stating:

---

**3.** Rule 3.02 states:

"Licensees shall cooperate with representatives of the Board, members of the Police Department, Health Department, Building Engineer's office, Grand Jury and representatives of other governmental agencies whenever such persons are on official business."

"The Liquor Board ... correctly interpreted Article 2B § 11–304(d).

\* \* \*

"Licensee concedes that on its face, the statute requires it to 'cease all operations' after 2:00 a.m. However, Licensee argues that when read together with § 11–305(d), it is permitted to remain open after 2:00 a.m. because it provided entertainment.

\* \* \*

"Nothing in the language of 11–305(d) supports the argument that it implicitly grants a license, and any such interpretation would violate all rules of statutory construction.... Section 11–304(d)(2) was enacted after § 11–305(d) .... § 11–304(d)(2) is the specific provision and it controls. The fact that Licensee has a Use and Occupancy Permit ... that satisfies the provisions of § 11–305(d) does not require a different result.

"Section 11–304(d)(2) does not violate the Home Rule Amendment because it does not regulate zoning. Thus, *Parks [Park] v. Board,* 338 Md. 366, 658 A.2d 687 (1995) is inapplicable. Furthermore, it does not violate the First Amendment and/or Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The statute does not suppress or greatly restrict access to live entertainment, which is afforded protection under the First Amendment, and there is a rational basis that justifies treating live entertainment places differently than the other businesses exempted."

Piscatelli noted an appeal to the Court of Special Appeals. Prior to any proceedings in the Court of Special Appeals, this Court issued a writ of certiorari. *Piscatelli v. Board of Liquor,* 371 Md. 613, 810 A.2d 961 (2002).

## II.

In accordance with "the established principle that a court will not decide a constitutional issue when a case can

properly be disposed of on a non-constitutional ground," [4] we shall first address Piscatelli's statutory interpretation issue. If Piscatelli's "after hours" operation does not violate Article 2B, § 11–304(d)(2), it will not be necessary for us to reach the state and federal constitutional issues raised by Piscatelli.

Article 2B, § 11–304, provides in relevant part as follows (emphasis added in subsection (d)(2)):

" **§ 11–304. Consumption—In general.**

"(a) *Consumption between 2 a.m. and 6 a.m. prohibited; penalty.*—(1) Between 2 a.m. and 6 a.m. on any day, a person may not consume any alcoholic beverages on any premises open to the general public, any place of public entertainment, or any place at which setups or other component parts of mixed alcoholic drinks are sold under any license issued under the provisions of the Business Regulation Article, and an owner, operator or manager of the premises or places may not knowingly permit such consumption.

"(2) Except as provided in this section, any person found consuming any alcoholic beverage on any premises open to the general public, and any owner, operator or manager of those premises or places who knowingly permits consumption between the hours provided by this section is guilty of a misdemeanor and, upon conviction, shall be fined not more than $50 and not less than $5.

\* \* \*

"(d) *New Year's Day exception.*—(1) Except as provided in this subsection, this section does not apply to premises conducted on New Year's Day by on-sale licensees in Baltimore City.

---

4. *Telnikoff v. Matusevitch,* 347 Md. 561, 579 n. 15, 702 A.2d 230, 239 n. 15 (1997), and cases there cited. *See also, e.g., Murrell v. Baltimore,* 376 Md. 170, 191 n. 8, 829 A.2d 548, 560 n. 8 (2003); *Jordan v. Hebbville,* 369 Md. 439, 461 n. 20, 800 A.2d 768, 781 n. 20 (2002); *McCarter v. State,* 363 Md. 705, 712–713, 770 A.2d 195, 199 (2001); *Montgomery County v. Broadcast Equities, Inc.,* 360 Md. 438, 461, 758 A.2d 995, 1007 (2000), and cases there cited.

"(2) In Baltimore City, *a licensed premises shall cease all operations, including the serving of* alcoholic beverages or *food and providing entertainment, at the closing hour for that class of licensed premises* specified in this article.

"(3) Notwithstanding paragraph (2) of this subsection, the Board of Liquor License Commissioners may grant an exemption for remaining open after hours to:

"(i) A holder of a Class B restaurant license, only for serving food to patrons seated for dining; or

"(ii) A pharmacy that fills prescriptions.

"(4) A pharmacy that receives an exemption under paragraph (3) of this subsection may also sell products other than alcohol after normal closing hours.

"(5) Notwithstanding the hour restrictions under paragraph (2) of this subsection, a hotel that holds a Class B license and serves food to seated customers or to private functions or guest rooms may continue to provide food service."

Piscatelli "acknowledges that a plain reading of Article 2B, § 11–304(d), without reference to any other provisions of the liquor laws, would support the Liquor Board's position that Licensee did not come within one of the exemptions specified in that subsection, and would therefore be required to close all business operations at 2:00 a.m." (Appellants' brief at 5).

Nevertheless, Piscatelli argues that Article 2B, § 11–305(d), "provides a fourth exemption to the proscription outlined in Article 2B, § 11–304(d)." (*Ibid.*). Section 11–305(d) states as follows:

"(d) *Registration, compliance with other laws.*—The owner, operator, or manager of any premises open to the general public or of any place of public accommodation where any form of entertainment is provided between 2 a.m. and 6 a.m. on any day and where alcoholic beverages are consumed at any hour of the day shall:

"(1) Register with the fire department and the Department of Housing and Community Development; and

"(2) Comply with all federal, State, and city building, fire, health, and zoning laws."

Section 11–305(d), however, does not contain an authorization for any licensee to operate or provide entertainment between 2 a.m. and 6 a.m. Rather, the statutory provision simply imposes certain registration and compliance obligations upon a licensee which is authorized to, and does, operate and provide entertainment between 2 a.m. and 6 a.m. The holder of a class B–D–7 license is not so authorized.

■ Moreover, Piscatelli's interpretation of § 11–305(d) would render nugatory the prohibition in § 11–304(d)(2) that a class B–D–7 licensee "cease all operations, including ... providing entertainment," between 2 a.m. and 6 a.m. As this Court has often emphasized, "we do not construe enactments so as to render 'any portion ... superfluous or nugatory,'" *Atlantic Golf v. Maryland Economic Development Corporation,* 377 Md. 115, 125, 832 A.2d 207, 213 (2003), quoting *Facon v. State,* 375 Md. 435, 446, 825 A.2d 1096, 1102 (2003).

The legislative history of § 11–304(d)(2) confirms the Liquor Board's interpretation of the statutory provision. Section 11–304(d)(2) was added to Article 2B by House Bill 1154 of the 2000 session of the General Assembly.[5] The Floor Report for House Bill 1154 set forth the Bill's purpose as follows (emphasis supplied):

"The current [Liquor] Board policy is to require all licensees to cease all operations, except for the sale of food, at the closing hour specified for that class of license. This requirement, however is not specified in the State law, and certain licensees have challenged the Board's authority to adopt and enforce this policy. This bill addresses this problem by expressly requiring licensees to cease *all operations* at the closing hour for that class of license."

---

5. House Bill 1154 was cross-filed with an identical Senate Bill (Senate Bill 796) at the same session.

This language shows the General Assembly's intent that, under § 11-304(d)(2), a licensee with a B-D-7 license must cease *all* operations between 2 a.m. and 6 a.m.

Finally, even if we were to agree with Piscatelli's interpretation of § 11-305(d), which would make it inconsistent with § 11-304(d)(2), the language of § 11-304(d)(2) would be controlling. Section 11-305(d) was enacted by Ch. 482 of the Acts of 1993, to be effective October 1, 1993. Section 11-304(d)(2), as previously pointed out, was enacted seven years later, by Ch. 461 of the Acts of 2000. Consequently, as the later enacted statute, the language of § 11-304(d)(2) would control to the extent of any inconsistency. *See, e.g., Haub v. Montgomery County,* 353 Md. 448, 462, 727 A.2d 369, 376 (1999) ("the later enactment prevails to the extent of any inconsistency"), and cases there cited.

## III.

■ Piscatelli's principal argument is that the General Assembly's enactment of § 11-304(d)(2), insofar as the statute prohibits the serving of food and providing entertainment after 2 a.m., violated the constitutional restrictions upon the General Assembly's authority which are set forth in Article XI-A of the Maryland Constitution. Piscatelli chiefly relies upon this Court's decision in *Park v. Board of Liquor License Commissioners,* 338 Md. 366, 658 A.2d 687 (1995).

■ Baltimore City is a charter home rule jurisdiction under Article XI-A of the Maryland Constitution. As we have pointed out on numerous occasions, Article XI-A enabled Baltimore City and counties " 'which chose to adopt a home rule charter, to achieve a significant degree of political self-determination.' " *Holiday Universal v. Montgomery County,* 377 Md. 305, 313, 833 A.2d 518, 523 (2003), quoting *Tyma v. Montgomery County,* 369 Md. 497, 504, 801 A.2d 148, 152 (2002). Article XI-A's "purpose was to transfer the General Assembly's power to enact many types of . . . public local laws to the Art. XI-A home rule" jurisdictions, *McCrory Corp. v. Fowler,* 319 Md. 12, 16, 570 A.2d 834, 835-836 (1990).

Article XI-A, § 2, of the Constitution requires the General Assembly to enact a grant of express powers for Baltimore City and the counties which have adopted home rule charters. The provision states: ·

"The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland [now codified as Article II of the Baltimore City Charter] shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly."

Most of the express powers granted by the General Assembly pursuant to Article XI-A, § 2, are contained in Maryland Code (1957, 2001 Repl.Vol.), Article 25A for home rule counties, and in Article II of the Baltimore City Charter for the City of Baltimore. Some additional express powers are set forth in other public general laws. For example, Maryland Code (1957, 2003 Repl.Vol.), Article 66B, §§ 2.01 *et seq.*, expressly grants zoning authority to the Mayor and City Council of Baltimore. *See Park v. Board of Liquor License Commissioners, supra,* 338 Md. at 379, 658 A.2d at 693.

Article XI-A, § 4, of the Maryland Constitution further provides in pertinent part as follows:

"From and after the adoption of a charter under the provisions of this Article by the City of Baltimore or any County of this State, no public local law shall be enacted by the General Assembly for said City or County on any subject covered by the express powers granted as above provided. * * * "

In *State's Attorney of Baltimore City v. City of Baltimore,* 274 Md. 597, 604–605, 337 A.2d 92, 97 (1975), quoting *State v. Stewart,* 152 Md. 419, 424, 137 A. 39, 41–42 (1927), we discussed the interplay of Article XI-A, §§ 2 and 4, as follows:

"Under these sections, while the General Assembly has the authority to determine what powers are to be exercised by Baltimore City or the charter counties, the General Assembly may not enact a *public local law* for the City or any charter county which modifies the powers so granted. If the General Assembly wishes to diminish the powers granted to Baltimore City or a charter county, it must do so by amending the acts which granted the powers. It may not do so by enacting a separate public local law which is merely inconsistent with the acts granting the express powers to the City or to the charter counties. These principles were explained by Judge [W. Mitchell] Digges for the Court in *State v. Stewart, supra*, 152 Md. at 424, 137 A. 39, as follows:

'If the General Assembly, in its grant of powers to Baltimore City, subsequently concludes that the grant of powers contained a subject upon which the General Assembly should have authority to legislate, and not the city authorities, it can only accomplish this by amending or repealing the act granting and delineating the powers. The Legislature has the power to describe the field within which the local authorities may legislate, but having once done this, it cannot restrict or limit this field of legislation without changing its boundaries. The legislation in respect to the subjects contained in the granted powers is therefore committed exclusively to the local authorities and denied to the General Assembly, so long as the grant of powers remained unchanged. Any other interpretation would render the provisions of article 11A meaningless, and result in nullifying the purpose sought to be accomplished by its adoption. If the Legislature could change the grant of power by the simple expedient of passing an act in conflict with the legislation of the local authorities, it would result in the complete frustration of the object of the amendment.' "

As earlier pointed out, the authority to enact local zoning laws is among the express home rule powers granted to Baltimore City. In addition, the authority "[t]o ... regulate

... the ... sale and disposition of food of every kind" is included among Baltimore City's express powers. *See* Article II, § 8, of the Baltimore City Charter.

■ On the other hand, the regulation of alcoholic beverages is not within the express powers granted to Article XI-A home rule jurisdictions. Instead, the "General Assembly has preempted this area by Art. 2B of the Code," *Coalition v. Annapolis Lodge*, 333 Md. 359, 362 n. 1, 635 A.2d 412, 413 n. 1 (1994). *See, e.g., Board of Liquor v. Hollywood*, 344 Md. 2, 12–13, 684 A.2d 837, 842–843 (1996) ("The Maryland General Assembly, under Article 2B, indeed regulates the sale and distribution of alcoholic beverages with uncommon precision.... Rather than providing broad general guidelines, the General Assembly has chosen to closely control by statute even the more detailed aspects of the alcoholic beverages industry"); *State v. Petrushansky*, 183 Md. 67, 70–71, 36 A.2d 533, 535 (1944) (discussing the history of Article 2B's enactment); *Montgomery Co. v. Board of Supervisors of Elections*, 53 Md.App. 123, 127, 451 A.2d 1279, 1281 (1982) ("the Legislature has preempted the field of the regulation and control of alcoholic beverages").

Piscatelli argues that Article 2B, § 11–304(d)(2), is not a law regulating alcoholic beverages. Instead, he contends (appellants' brief at 10):

"Article 2B, § 11–304(d) for the first time attempts to regulate the hours of operation for business operations totally unrelated to the sale or consumption of alcoholic beverages. It effectively precludes Licensee's permitted use as an after hours establishment. Therefore, it has gone beyond a lawful liquor regulation and has become an unauthorized zoning regulation."

Piscatelli points out that he was "approved for a conditional use as an after hours establishment" pursuant to the Baltimore City zoning regulations, that he "was issued a Use and Occupancy Permit ... authorizing [him] to 'use premises as a restaurant tavern with live entertainment and dancing with after hours establishment,'" and that the Liquor Board's

enforcement of § 11–304(d)(2) "totally preclud[es Piscatelli] from using [his] premises" in accordance with the local zoning regulations. (*Id.* at 8–10). According to Piscatelli, the enactment of § 11–304(d)(2) violated Article XI–A, § 4, of the Constitution because it is a public local zoning law, and zoning is within the express powers granted to Baltimore City. Piscatelli claims that our decision in *Park v. Board of Liquor License Commissioners, supra,* 338 Md. 366, 658 A.2d 687, "is controlling." (*Id.* at 9).

The *Park* case involved several Baltimore City alcoholic beverage package goods stores having no facilities for on-premises consumption of alcoholic beverages. They held class B–D–7 liquor licenses which permitted the sale of alcoholic beverages for consumption on or off the premises from 6 a.m. to 2 a.m. seven days per week. By Ch. 24 of the Acts of 1992, the General Assembly authorized for Baltimore City a new class A–2 liquor license, restricted to the sale of alcoholic beverages for off-premises consumption and restricted to sales between 9 a.m. and midnight, Monday through Saturday. Ch. 24 of the Acts of 1992 further provided that the holders of all class B–D–7 licenses were required either to have on-premises consumption facilities, or to add on-premises consumption facilities to their operations, or to obtain the new class A–2 licenses which were more restrictive with regard to hours and days of operations.

These new requirements in Ch. 24 of the Acts of 1992, however, presented zoning problems for many of the package goods stores holding class B–D–7 licenses and selling alcoholic beverages only for off-premises consumption. These class B–D–7 licensees were operating under non-conforming use zoning permits and zoning requirements, and a change either to add on-premises consumption facilities, or to obtain a new class A–2 license, would arguably violate the non-conforming use permits and requirements. Consequently, prior to the General Assembly's enactment of Ch. 24 of the Acts of 1992, a bill was drafted for introduction in the Baltimore City Council to give these package goods licensees protection from the local zoning requirements after they made the changes required by

the proposed Ch. 24. When the zoning bill was not enacted by the Baltimore City Council, the bill in the General Assembly, which became Ch. 24, was amended to grant the zoning protection. Ch. 24 of the Acts of 1992 enacted a new § 18A(h) to Article 2B, providing that, "for purposes of zoning in Baltimore City, the operation conducted by a holder of a Class A–2 beer, wine and liquor off-sale package goods license shall be considered to be that of a tavern."

This Court in *Park* held that § 18A(h), despite its codification in Article 2B of the Maryland Code, was a local zoning statute. Judge Karwacki for the Court in *Park* stated (338 Md. at 376, 658 A.2d at 692):

"It is clear that the intent of the Legislature was to mandate that the Zoning Administrator of Baltimore City include Class A–2 package goods stores within the definition of 'tavern' for the purpose of enforcing the Baltimore City Zoning Ordinance."

* * *

"The clear intent of the Legislature was to address the growing problems associated with seven-day package goods stores while protecting the interests of those B–D–7 licensees who had operated for many years in such a manner with the tacit approval of the Board. The Legislature knew that without § 18A(h), the B–D–7 package goods stores could be closed under Baltimore City zoning regulations. Section (h) was added so that 'no rezoning will be required in changing the license from a B–D–7 license to the A–2 license.' The intent of the Legislature to make a zoning change is also plain on the face of the statute, and we must give effect to that intent as expressed by the Legislature."

After explaining that § 18A(h) affected only Baltimore City and thus was a public local law, and that zoning was within the express powers granted to Baltimore City, the Court in *Park* concluded (338 Md. at 380, 658 A.2d at 694): "Modifying the definition of a 'tavern' under the zoning laws, therefore, is a task reserved to the Mayor and City Council of Baltimore."

As Article XI–A, § 4, of the Constitution prohibited the General Assembly from enacting "a public local law . . . on any subject covered by the express powers granted," the *Park* opinion held that Art. 2B, § 18A(h), was unconstitutional.

Unlike § 18A(h) involved in *Park,* § 11–304(d)(2) does not in any manner change Baltimore City zoning law. It gives no directions to, and imposes no requirements upon, the Baltimore City zoning authorities. If Piscatelli were not a liquor licensee, he could operate the restaurant and provide entertainment after 2 a.m. in accordance with the applicable zoning.

Piscatelli's theory seems to be that, whenever an enactment of the General Assembly has the effect of precluding activity expressly authorized by local zoning regulations in an Article XI–A jurisdiction, such enactment is a "zoning law." This is not what the *Park* case held, and the theory is untenable. The General Assembly may properly enact numerous statutes in many areas of the law, such as environmental statutes, acts affecting natural resources, public health enactments, etc., which may happen to have, as consequences, the prohibition of activities permitted by local zoning regulations or the express authorization of activities prohibited by local zoning regulations. *See, e.g., Soaring Vista v. Queen Anne's County,* 356 Md. 660, 741 A.2d 1110 (1999); *Talbot County v. Skipper,* 329 Md. 481, 620 A.2d 880 (1993); *Howard County v. Pepco,* 319 Md. 511, 573 A.2d 821 (1990). Simply because an enactment by the General Assembly affects the activities which are otherwise allowed or disallowed under local zoning regulations, does not make the state enactment a "zoning law."

■ Article 2B, § 11–204(d)(2), is a statute regulating liquor licensees and not a zoning law. The restriction imposed by § 11–304(d)(2) is a direct consequence of Piscatelli having been granted a liquor license. A liquor license is privilege, and in granting the license, the Legislature " 'may annex . . . such conditions as are deemed necessary to prevent an abuse of the privilege,' " *Dundalk Liquor Co. v. Tawes,* 201 Md. 58, 65, 92 A.2d 560, 563 (1953). The requirement that a liquor licensee cease operations at the same time that liquor sales

must cease, clearly helps prevent illegal after hours sales of alcoholic beverages. In the instant case, one of the Liquor Board's inspectors testified before the Board that, after 2 a.m. on December 8, 2001, he "observed patrons still seated at [Piscatelli's] Sushi bar consuming beverages in plastic cups with ice and some clearly marked bottles...." Contrary to Piscatelli's argument, § 11–304(d)(2) is *not* "totally unrelated to the sale or consumption of alcoholic beverages." (Appellants' brief at 10).

The Circuit Court, therefore, correctly held that Article 2B, § 11–304(d)(2), did not violate Article XI-A of the Maryland Constitution.

## IV.

Piscatelli asserts that Article 2B, § 11–304(d)(2), "violates both the First Amendment and [the] Equal Protection Clause of the Fourteenth Amendment to the [United States] Constitution by improperly singling out liquor license establishments that provide live entertainment and/or dancing, by requiring those establishments to close when alcohol can not be sold, but allowing certain restaurants, pharmacies and hotels to remain open. Such a distinction fails even a rational basis standard and the law must be stricken." (Appellants' brief at 11).

### A.

Preliminarily, live entertainment of the sort at issue in the instant case would not appear to be protected by the First Amendment. The United States Supreme Court, in *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), held that an ordinance which restricted attendance in some dance-halls to minors between the ages of 14 and 18 did not violate freedom of expression or association protected by the First Amendment. Specifically, the United States Supreme Court stated in *City of Dallas,* 490 U.S. at 24–25, 109 S.Ct. at 1595, 104 L.Ed.2d at 25–26, as follows:

"The Texas Court of Appeals ... thought that such patrons were engaged in a form of expressive activity that was protected by the First Amendment. We disagree.

"The Dallas ordinance restricts attendance at Class E dance halls to minors between the ages of 14 and 18 and certain excepted adults. It thus limits the minors' ability to dance with adults who may not attend, and it limits the opportunity of such adults to dance with minors. These opportunities might be described as 'associational' in common parlance, but they simply to not involve the sort of expressive association that the First Amendment has been held to protect. The hundreds of teenagers who congregate each night at this particular dance hall are not members of any organized association; they are patrons of the same business establishment. Most are strangers to one another, and the dance hall admits all who are willing to pay the admission fee. There is no suggestion that these patrons 'take positions on public questions' or perform any of the other similar activities described in *Board of Directors of Rotary International v. Rotary Club of Duarte,* 481 U.S. 537, 548[, 107 S.Ct. 1940, 95 L.Ed.2d 474] (1987).

"The cases ... recognize that 'freedom of speech' means more than simply the right to talk and to write. It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. We think the activity of these dance-hall patrons—coming together to engage in recreational dancing—is not protected by the First Amendment. Thus this activity qualifies neither as a form of 'intimate association' nor as a form of 'expressive association' as those terms were described in *Roberts* [*v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ]."

■ The entertainment offered by Piscatelli at his establishment is dancing to music provided by disc jockeys, which is indistinguishable from the recreational dancing that was the

subject of the challenged regulation in *City of Dallas v. Stanglin, supra*. As such, it is not activity protected by the First Amendment.

■ Even assuming, *arguendo*, that entertainment of the type at issue in the case at bar were protected by the First Amendment, § 11–304(d)(2) would be subject to intermediate scrutiny as a "time, place and manner restriction," because, as Article 2B makes clear, the purpose of the regulation of liquor sales and consumption in this State is to "obtain respect and obedience to law and to foster and promote temperance." Art. 2B, § 1–101(a). As such, it meets the test set forth by the United States Supreme Court in that such regulations " 'are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication,' and provided that the government interest is independent of First Amendment concerns." *See Pack Shack v. Howard County*, 377 Md. 55, 67, 832 A.2d 170, 177 (2003), quoting *Renton v. Playtime Theatres*, 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29, 37 (1986).

In *Pack Shack v. Howard County, supra*, we invalidated an ordinance that regulated the location of adult entertainment businesses, because, *inter alia*, it left open too few locations where such businesses could lawfully operate. This, we held, failed the requirement articulated by the United States Supreme Court that constitutional "time, place and manner restrictions" leave open adequate alternative avenues of communication. *Pack Shack v. Howard County, supra*, 377 Md. at 80–84, 832 A.2d at 185–188. *See, e.g., Renton v. Playtime Theatres, supra*, 475 U.S. at 47, 106 S.Ct. at 928, 89 L.Ed.2d at 37; *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227 (1984); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680 (1968). *See also, State v. Sheldon*, 332 Md. 45, 54, 629 A.2d 753, 758 (1993).

■ Article 2B, § 11–304(d)(2), does not relate to the number of establishments. It simply concerns the hours of opera-

tion. Under § 11–304(d)(2), the licensee is required to cease operations for four hours out of twenty-four, which does not "unreasonably limit" available avenues for recreational dancing at either Piscatelli's establishment or similar establishments. Maintaining public order is a substantial government interest. Furthermore, the State has the authority to regulate the sale and consumption of alcohol in public places. *See, e.g., Board of License Commissioners for Charles County v. Toye,* 354 Md. 116, 125–126, 729 A.2d 407, 412 (1999); *State v. Petrushansky, supra,* 183 Md. at 70–71, 36 A.2d at 535. As such, § 11–304(d)(2), satisfies any requirements for "time, place and manner restrictions" upon activity arguably protected by the First Amendment.

### B.

Piscatelli also asserts that § 11–304(d)(2) violates the Equal Protection Clause of the Fourteenth Amendment because it treats liquor licensed establishments that offer entertainment differently from some other restaurants and hotels.

 " 'When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude.' " *Maryland Aggregates Ass'n v. State,* 337 Md. 658, 672, 655 A.2d 886, 893(1995), quoting *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985). Furthermore, we stated in *Maryland Aggregates Ass'n v. State, supra,* 337 Md. at 673–674, 655 A.2d at 893–894:

> " '[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.... This standard of review is a paradigm of judicial restraint.'

**644**

"While this Court has not hesitated to strike down discriminatory economic regulation that lacked any reasonable justification, *e.g., Verzi v. Baltimore County,* 333 Md. 411, 635 A.2d 967 (1994), and *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372 (1993), we nevertheless accord to the decisions of legislative bodies a strong presumption of constitutionality. In *Murphy v. Edmonds,* 325 Md. 342, 367, 601 A.2d 102, 114 (1992), we quoted the summary of rational basis review set forth in *Whiting–Turner Contract. Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985), which stated that a statute

'can be invalidated only if the classification is without any reasonable basis and is purely arbitrary. Further, a classification having some reasonable basis need not be made with mathematical nicety and may result in some inequality. If any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time the law was enacted must be assumed.'

"See also *Briscoe v. P.G. Health Dep't,* 323 Md. 439, 448–449, 593 A.2d 1109, 1113–1114 (1991); *Hargrove v. Board of Trustees,* 310 Md. 406, 423, 529 A.2d 1372, 1380 (1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988); *Broadwater v. State,* 306 Md. 597, 607, 510 A.2d 583, 588 (1986); *State v. Wyand,* 304 Md. 721, 726–727, 501 A.2d 43, 46 (1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986); *Department of Transportation v. Armacost,* 299 Md. 392, 409, 474 A.2d 191, 199 (1984); *State v. Good Samaritan Hospital,* 299 Md. 310, 328, 473 A.2d 892, 901, appeal dismissed, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984)."

██ Furthermore, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or

because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369." *City of Dallas v. Stanglin, supra,* 490 U.S. at 26, 109 S.Ct. at 1596, 104 L.Ed.2d at 26–27 (some internal quotation marks omitted).

 Thus, a law will survive rational basis scrutiny if there is some reasonable connection between the law and its stated intent, as there is in this case. If licensees were permitted to remain open after 2:00 a.m., patrons could possibly purchase alcoholic beverages just prior to that time, and continue consumption. As earlier mentioned, there is some evidence in the record that patrons in Piscatelli's establishment may have, in fact, been consuming alcohol after 2 a.m., in violation of § 11–304(d). Thus, the Liquor Board's task of enforcing compliance with the law that alcohol *consumption,* and not merely sales, in public places of entertainment cease after 2 a.m., is made much easier by a requirement that all operations cease for the four hours from 2 a.m. to 6 a.m. daily, as required by § 11–304(d)(2). If the establishment were closed, the Board could be reasonably certain that no alcohol sales or consumption would take place after closing time at that establishment.

Moreover, the General Assembly could have reasonably concluded that the patrons of an establishment like Piscatelli's that offers entertainment might be more likely to disturb the public in the early morning hours than the patrons of restaurants and hotels where food is served to persons seated in dining rooms. There is a rational basis for the classification contained in § 11–304(d), which is all that is required under the Fourteenth Amendment's Equal Protection Clause. *City of Dallas v. Stanglin, supra,* 490 U.S. at 26–27, 109 S.Ct. at 1596, 104 L.Ed.2d at 26–27.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANTS TO PAY COSTS.*